IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION


UNITED STATES OF AMERICA,            )
                                     )
                  Plaintiff,         )
                                     )
             v.                      )   No. 3:07-CR-00159-1
                                     )   C.O.A. No. 10-5939
JAMES C. McWHORTER,                  )
                                     )
                  Defendant.         )   **VOLUME 8**
                                     )
_____)


------------------------------------------------------------

    BEFORE THE HONORABLE ROBERT L. ECHOLS, SENIOR JUDGE
                TRANSCRIPT OF PROCEEDINGS
                     June 28, 2010

------------------------------------------------------------


APPEARANCES:

For the Plaintiff:        TY E. HOWARD
                          Assistant United States Attorney
                          110 Ninth Avenue South
                          Suite A-961
                          Nashville, Tennessee 37203



For the Defendant,        JEFFREY S. FRENSLEY
                          Attorney at Law
                          211 Third Avenue, N
                          Nashville, Tennessee 37219



PREPARED BY:    DOROTHY STILES, RMR, CRR
                Official Court Reporter
                801 Broadway - Room A-837
                Nashville, Tennessee 37203
                615.330.1764

1                                    **I N D E X**

2          **WITNESS:**

3          MATTHEW STEVENSON
           Direct Examination by Mr. Howard              Page 561
4          Cross Examination by Mr. Frensley           Page 577

5


6
           SENTENCING                                   Page 687
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           The above-styled cause came on to be heard

2     on June 28, 2010, at 10:00 a.m., before the Honorable

3     Robert L. Echols, Senior Judge, when the following

4     proceedings were had, to-wit:

5           THE COURT:  Be seated, please.

6         I apologize to the lawyers and others.  I had a doctor's

7     appointment this morning and I had to wait, and it was longer

8     than I thought.  So we're a little late getting started.

9         The first case today is United States of America vs.

10    James C. McWhorter, Criminal Case 3:07-00159.

11        The case is scheduled today for the sentencing of

12    Mr. McWhorter.  Mr. McWhorter was one of nine defendants

13    charged in this case, which involved a conspiracy to commit

14    crimes against the United States.  More specifically, they

15    were related to identity theft and the production of false

16    identification documents and so forth.

17        Mr. McWhorter is represented today by Mr. Jeffrey

18    Frensley, who represented him at his trial.  Mr. Ty Howard is

19    here representing the United States Attorney's office.

20        This case went to trial.  And the jury found on November

21    the 20th, 2009 that Mr. McWhorter was guilty of all five

22    counts listed in the Second Superceding Indictment issued

23    against him in May of 2009.

24        After the trial, the probation department prepared its

25    normal sentencing memorandum -- pretrial report, rather, and

1    furnished it to the lawyers.  There are some objections to

2    that report filed by the defendant.

3        Mr. McWhorter has been in jail since, I think, November

4    of 2006.  So that report has been revised -- it was revised

5    on June the 10th.

6        Are there any objections to the revised report?  I'm not

7    aware of any that haven't been filed.

8            MR. FRENSLEY:  There are, and they have been filed,

9    Your Honor.

10            THE COURT:  Okay.  Okay, we'll take up those

11   objections.

12       Mr. Frensley has set forth those objections in a report

13   filed with the Court.  Of course, the Government has a copy

14   of it.  He has also filed a *Sentencing Memorandum*.

15       The Government also has filed a *Sentencing Memorandum*

16   and takes issue with the objections filed by Mr. Frensley on

17   behalf of Mr. McWhorter.

18       So we'll begin there, unless the lawyers think they have

19   something else that should be addressed before we get to the

20   objections.  If not, we'll start with those objections.

21       Okay, Mr. Frensley.  Yours are set forth clearly in your

22   paper, and they begin with the amount of loss.

23       The presentence report itemized the loss, as contained

24   in Paragraphs 24 and 25 of the *Presentence Investigative*

25   *Report*.

1    The greatest loss, of course, was sustained by Wal-Mart.

2    And in the presentence report there are two figures listed.

3    One is the actual loss by the victims of the fraudulent

4    checks, and the other category was intended loss.

5    There were apparently hundreds of checks that were

6    produced.  And many of those were passed, but many were not

7    passed.  And so those intended losses are also stated in

8    Paragraphs 24 and 25.

9    The report indicates that the actual loss was

10   $128,383.55.  I believe that's been modified by the

11   Government.  Then there's the other element of the loss,

12   which is the intended loss.  The presentence report indicates

13   that that's $118,064.89.  Those being checks that were

14   attempted to be cashed, but they were not cashed.  They were

15   unsuccessful in doing so.  So the presentence report comes up

16   with a total loss of $246,448.44.

17   So, Mr. Frensley, I'll be happy to hear from you more

18   specifically on the amount of loss.

19   That's followed, of course, by another objection.

20   Basically, that Mr. McWhorter should be given some credit for

21   his acceptance of responsibility in Counts 1 through 4.

22   And then there's an objection to the enhancement in the

23   presentence report for use of the authentication features in

24   the driver's licenses.

25   These were false checks, but also fraudulent driver's

 1        licenses that were to be matched with the checks in order to

 2        facilitate the passage of these checks, most of which were

 3        payroll checks that were also fraudulently created as part of

 4        the scheme.

 5            And, lastly, I believe there is an objection to the

 6        enhancement, as suggested in the presentence report, that

 7        Mr. McWhorter was a leader or manager of this conspiracy.

 8        And he received in the calculations by the presentence report

 9        writer four points, four levels.

10            Okay, Mr. Frensley.

11                MR. FRENSLEY:  Thank you, Your Honor.

12            May it please the Court.  As Your Honor is well aware,

13        when determining the guidelines for offenses that are

14        financial in nature, loss is the driving factor.  The

15        Government bears the burden of proof of establishing the

16        amount of loss and must do so by a preponderance of the

17        evidence.

18            The Sixth Circuit has held in *United States vs. Comer*

19        that the loss can't be speculation alone.  There has to be

20        some articulable basis for proving that loss.

21            In this case on the issue of loss, Your Honor will

22        recall at trial the Government called Kathy Sawn, who was an

23        investigator for Wal-Mart, who testified about the loss to

24        Wal-Mart.  And her testimony under oath at trial put that

25        loss at approximately $39,000.

1       Now, I understand that that wasn't -- it wasn't clear

2    whether that was to reach intended loss, actual loss, or

3    what; but that was the testimony of the Wal-Mart fraud

4    investigator with respect to the amount of loss at that time.

5       There was, as Your Honor noted, an initial presentence

6    report in this matter, wherein the Government provided

7    certain information upon which the probation officer could

8    determine the amount of loss.  And in that initial report,

9    Your Honor, the amount of loss was put at $281,256.95.

10       There was the second and revised report in this case

11    where, as Your Honor has just indicated, the loss is at

12    $214,208.29.  And then now, the Government has filed in its

13    position paper a further adjustment to that, reflecting a

14    loss of $203,884.83, of actual loss.

15       The loss according to the guidelines is separated into

16    two categories, as Your Honor indicated.  First is actual

17    loss.  That is for the amounts of loss attributed to checks

18    that were actually cashed.  The second is to reach intended

19    loss.  And that is those attempts to pass a check that did

20    not, for whatever reason, result in the check actually being

21    passed.

22       In this case, with respect to the losses in question,

23    the real issue, Your Honor, boils down to the loss

24    attributable to Wal-Mart in this case.  Because those are the

25    ones which, first of all, account for the most significant

1    amounts of loss in this case; and, secondly, are the ones

2    upon which the Government has actually provided some type of

3    documentation, albeit changing over the course of the

4    proceedings.

5        With respect to the actual loss, Your Honor, that actual

6    loss was indicated and reflected, with respect to Wal-Mart,

7    downward to amount to now $85,819.94 is the loss that the

8    Government suggests Wal-Mart has suffered.

9        And the basis for that loss, Your Honor, is what I

10   understand the Government has filed as an attachment to its

11   position and would be reflected in Exhibit B to that

12   attachment.

13       First of all, Your Honor, we would submit that this

14   doesn't meet the test with respect to the burden that the

15   Government bears.  While hearsay is admissible in sentencing

16   proceedings and while the burden of proof is not as great as

17   it would be at trial, I respectfully submit that merely

18   having Wal-Mart or someone put together a spreadsheet that

19   purports to represent certain checks does not meet the burden

20   that the Government must carry in this matter.

21       To that extent, the only competent evidence with respect

22   to actual loss is the trial testimony of Ms. Sawn, which

23   would be $39,000.

24       However, Your Honor, even setting forth that, it's my

25   understanding that the Government's pleading at Exhibit B

that deals with actual loss contains certain highlighted

areas that the Government purports to deduct from the total.

Again, Wal-Mart apparently has given them this

information.  They've gone through and recognized that some

of these things --

For example, on Page 1 of Exhibit B, the first ten

entries, Your Honor, are all entries that purport to be loss

attributable to Mr. McWhorter that occurred prior to the

events giving rise to this case.

Your Honor will recall from the trial testimony that

Mr. McWhorter had been serving a prison sentence in the

Tennessee Department of Correction.  And, therefore, the

Government has retracted these items because they all

occurred when Mr. McWhorter was actually serving a sentence

and prior to the initiation of this conspiracy at issue.

The documents likewise contain additional entries which

the Government has, to their credit, redacted or retracted.

At Entries 30 and 31 are checks that were purportedly cashed

in Green Bay, Wisconsin.

Again, I think the trial testimony in this case was

pretty clear as to the areas of Nashville, Davidson County,

and then eastward toward the plateau, as to where these

events occurred.

Likewise, Your Honor, this document includes certain

items that the Government has retracted that occurred after

1    Mr. McWhorter was arrested in this case and, therefore,

2    should not even have properly been a part of these

3    calculations.  Those begin at Entry No. 144, continuing

4    forward.

5        Now, this is significant for several reasons, Your

6    Honor.  First of all, because the Government purports to

7    derive its number from information provided by Wal-Mart.

8    This information provided by Wal-Mart, they even acknowledge

9    now in their pleadings, is not accurate or complete.

10       So I think it legitimately calls into question the other

11   entries that are contained therein and suggests that in the

12   absence of additional greater proof, that those entries, just

13   because Wal-Mart submitted them, don't meet the test with

14   respect to the Government's burden of proof.

15       There's another issue with respect to this spreadsheet

16   that's been provided at Exhibit B, and that is --

17       And I apologize, Your Honor, that this is so confusing,

18   but it occurred to me to check the math.  And I consulted

19   with Mr. Howard about this just before Your Honor came on the

20   bench, after having gone through the math on these

21   highlighted areas.  It appears that the math is wrong with

22   respect to the highlighted areas.

23       On the last page of Exhibit B where it has the totals,

24   it has a total for all of the check amounts as being

25   $96,143.40.  And then it has "less highlighted rows", which

1  purport to be the total of the highlighted rows.  And that
2  number is $10,332.46.
3      However, Your Honor, when I went through the highlighted
4  rows on my copy of that document, that total came to
5  $12,047.02.  And I did this math about five times.
6      I tell people that I became a lawyer because I didn't
7  really do very well at math, and that's why I checked it so
8  many times.  But I repeatedly got the same answer, which was
9  instead of the $10,323 it was $12,047.02.  Which would reduce
10  the total amount of actual loss even further.
11      Now, the Government -- in June, you'll recall that there
12  was a revision to the presentence report, where the
13  Government provided more refined evidence and documentation
14  with respect to the presentence report.  That was arranged in
15  a slightly different format than what's at Exhibit B, but I
16  suspect was the exact same information.
17      In our position paper, having reviewed those documents,
18  based upon items that were either before or after the
19  conspiracy --
20      And it's significant in this case because before and
21  after the conspiracy, you'll recall the testimony was that
22  Mr. McWhorter was in prison.  So that's why it's not just a
23  matter of was the conspiracy date accurate.  Mr. McWhorter
24  was unavailable to be involved in any such conspiracy.
25      But the number of -- the amount of overrepresentation

1    that we assert is included based on those before and after

2    dates, duplicate dates, and other entries not attributable to

3    Mr. McWhorter is $29,301.04.  And that's the amount that we

4    submitted in our position paper is overrepresented to

5    Wal-Mart in the actual loss.

6         So assuming the number that Mr. McWhorter submits, the

7    amount of actual loss to Wal-Mart would be $66,842.36.

8              THE COURT:  And did you get that figure by

9    subtracting the $29,301 from the $85,819?

10             MR. FRENSLEY:  It was actually subtracted from the

11   $96,143.40, which was the original number.

12             THE COURT:  All right.

13             MR. FRENSLEY:  Well, it was the second original

14   number, Your Honor.

15             THE COURT:  So you're saying rather than the setoff

16   for the highlighted rows of $10,323.46, it should have been

17   $29,301.04.

18             MR. FRENSLEY:  That's our position, Your Honor.

19             THE COURT:  Right.

20             MR. FRENSLEY:  However, we have a second position,

21   which is even if Your Honor only sets off the Government's

22   highlighted rows, that amount is inaccurate and it should

23   be --

24        If Your Honor just agrees with the Government, accepts

25   the Government's proof, those highlighted rows on my sheet

come to a total of $12,047.02.

Now, I've told Your Honor what our position is with respect to the amount of actual loss to Wal-Mart. And I've spoken a little bit to the Government's position on actual loss.

But looking at the spreadsheet, Your Honor, on actual loss that the Government has submitted, I would submit that there are additional entries that were not highlighted on my sheet that also should not be attributable to Mr. McWhorter. And if Your Honor will allow, I'll just go through those.

On my sheet, Your Honor, the first three entries, 1, 2, and 3 --

THE COURT:  What are you looking at now?

MR. FRENSLEY:  I'm looking at Exhibit B in the Government's pleading.

THE COURT:  That starts with No. 1.

MR. FRENSLEY:  Yes, Your Honor.  At the top of the page it says *Wal-Mart - Actual Loss*.

THE COURT:  Yes.  Okay.  And the first one is Edwards.

MR. FRENSLEY:  That's right, Your Honor.

On my sheet, Your Honor, Entries 1, 2, and 3 are not highlighted.  And if you go across the top row, again those three checks were cashed January '05 and February of '05, which again is the time that Mr. McWhorter was not in

1     custody -- or I'm sorry, was in state custody, prior to this

2     conspiracy beginning.

3         So I would submit that those three entries, Your Honor,

4     should also be added to the Government's list.  And those

5     total $400.

6             THE COURT:  Now, the first one was cashed

7     January 12th, '05.  The second one, January the 18th, '05.

8     The third one, according to mine, was February the 16th, '05.

9             MR. FRENSLEY:  That's right, Your Honor.

10            THE COURT:  Okay.

11            MR. FRENSLEY:  That's correct.

12         And, again, the conspiracy is alleged to have begun, in

13     the indictment, on or about March the 1st.  What's

14     significant is prior to that conspiracy beginning,

15     Mr. McWhorter was in prison.

16         So he was in prison during the time those three checks

17     were cashed and he couldn't have done it.  He couldn't even

18     have been involved in the conspiracy because the conspiracy

19     didn't begin, irrespective of the date, until after he was

20     released from custody.

21         So that would be an additional $400 to the Government's

22     amount.

23         And then, Your Honor, on Page 2, at Item No. 25.

24            THE COURT:  Okay.

25            MR. FRENSLEY:  If Your Honor will look at Items 24

1    and 25, they appear to be duplicate entries for the same

2    transaction.  24 and 25 both involved Mario Gray.  The

3    cashier address is the same.  The city and state are the

4    same.  The position check number is the same.  And all the

5    way across.

6        So I would submit that one of those entries should be

7    redacted, as well.  Because they're clearly duplicate entries

8    of the same transaction.

9        So that would be, on that page, an additional $498.64 to

10   be subtracted from the Government's number.

11               THE COURT:  Okay.

12               MR. FRENSLEY:  Then, Your Honor, at Entry No. 78.

13               THE COURT:  Okay.

14               MR. FRENSLEY:  On that entry, Your Honor, you'll

15   see there's some information that's not clear there.  It does

16   state that the name on the check is the State of Tennessee;

17   but then if you go across to the location at which that check

18   was passed, you'll see it's Grove City, Ohio.

19       Now, again, Your Honor, I submit that there's no

20   evidence that's been presented in any context with respect to

21   this case that there was any activity outside of Tennessee,

22   and certainly nothing to suggest that a check would have been

23   cashed in Grove City, Ohio.

24       I would submit that this, for whatever reason, just

25   appears to be an entry that was inadvertently included there.

1    So that check would amount to a reduction of $184.60.

2         The next entry, Your Honor is at Item 125.

3              THE COURT:  Okay.

4              MR. FRENSLEY:  And this check, Your Honor --

5              MR. HOWARD:  Which one?

6              MR. FRENSLEY:  125.

7              On this check the individual is someone named Ebony

8    Horton.  And if you go across to the end, Your Honor, where

9    this check was passed, it appears to have been passed in

10   Brownsville, Tennessee; which, of course, is in west

11   Tennessee.

12        And it is inconsistent with the entire body of these

13   checks.  There don't appear to be any other checks, for the

14   most part, cashed west of the Tennessee River.

15        Again, the trial testimony doesn't suggest there were

16   transactions made anywhere other than the Nashville area and

17   east, on the plateau.

18        So I respectfully submit that this entry, Ebony Horton,

19   is an inadvertent entry which should be deducted, as well, in

20   the amount of $134.71.

21        Next, Your Honor, is Entries 128 and 129.  These appear,

22   again, to be duplicate entries of the same transaction.  If

23   you carry each of those lines across, every line is

24   identical.  The position check number, the dates, the

25   cashier, the amounts, and the location.

1          THE COURT:  Okay.

2          MR. FRENSLEY:  So that would be, Your Honor, an

3     additional reduction of one of those checks, $498.32.

4          The next entry, Your Honor, is at 136.  This is a check

5     purportedly cashed by someone named Cynthia Jackson in the

6     amount of $84.  And the location was Bartlett, Tennessee;

7     which again, Your Honor, is the Memphis area.

8          It would be outside any evidence presented in this case

9     with respect to the scope of the action, and likewise is

10    inconsistent with the entire spreadsheet.

11         There really just -- there's just this couple of checks

12    in the Memphis area.  That would suggest, Your Honor, that

13    they are inadvertently included here and not attributable to

14    this conspiracy in any regard.  That check totals $84.

15         With that, Your Honor, the total amount of those checks,

16    using the Government's own document that they provided as

17    Exhibit B, that we take issue with is $1,800.27.

18         THE COURT:  Okay.

19         MR. FRENSLEY:  So if Your Honor were to accept the

20    Government's version of Exhibit B as the actual amount of

21    loss to Wal-Mart, taking into account the error in arithmetic

22    on the highlighted checks and this additional $1,800, we

23    would submit that the total amount of actual loss to Wal-Mart

24    under the Government's own calculations should be $82,296.11.

25         So that highlights the defendant's --

1          THE COURT:  You say the actual loss?

2          MR. FRENSLEY:  Actual loss.  Yes, Your Honor.

3     $82,296.11.

4          So with that, Your Honor, with respect to the actual

5     loss, we have our initial position with respect to what we

6     believe the amount is; but even if Your Honor were to accept

7     the Government's position, taking into account the arithmetic

8     error and the additional checks that I've submitted should

9     not have been counted as well because of duplication, outside

10    the time, or unrelated to the conspiracy in any regard, it

11    should result in a significantly lower number as well.

12         Unless Your Honor has any other questions about the

13    actual loss amount, I'll move to the intended loss issue.

14         THE COURT:  Okay.  Go ahead.

15         MR. FRENSLEY:  With respect to the intended loss,

16    Your Honor, the Government has asserted in its position paper

17    a position that basically every time an attempt was made,

18    that should be counted against the number for purposes of the

19    conspiracy.

20         We have in our position paper, Your Honor, submitted a

21    number of entries on the spreadsheet, which is I believe

22    Exhibit C to the Government's plea.  And the basis of our

23    argument here with respect to the overrepresentation is that

24    it appears that a number of these checks were attempted to be

25    passed within a very short period of time, at exactly the

same location.  And that, Your Honor, we would submit constitutes one intended loss.

And it's important, I think, Your Honor, to draw a distinction, as the guidelines do, between attempted and intended, because it's significant in this case.  And I'll give Your Honor an example here.

If Your Honor will look at Exhibit C, at Entries No. 12 and 13, I submit that this is representative of the kind of issue that we're raising with respect to the intended loss to Wal-Mart.

These checks to Wal-Mart at Entries 12 and 13 again match up in all regards all the way across the spreadsheet. They're the same date, the same check number, the same face amount, the same name, the same store, and the same --

And this last entry is significant, too, Your Honor, when it talks about station number.  It's my understanding and belief that what this represents is the particular cashier station where the check is attempting to be processed.

Now, if you look at 12 and 13, they're identical in all respects except one.  And the one area where they're not identical is the time.  And that's in the second substantive column, where it says *Eastern Time* at the top.

If you come down and look at the times on Entries 12 and 13, what you have is for Entry 12 they attempted to run that

check through the machine at 2203 and one second.  On 13,
they attempted to run that check through the machine at 2203
and six seconds.  So there's a five second difference between
these two entries, but in all other respects they're
identical.

What I would submit, Your Honor, is the more probable
explanation of what this is is that the cashier -- we've all
seen it happen in our common experience.  The cashier runs
the check.  And if for some reason it doesn't accept, they
run it back through again.

I would submit that given the time here between these
entries of just five seconds, that this doesn't constitute a
second intended loss.  These two entries represent one
intended loss.  And for whatever reason, the check was run
through more than -- on more than one occasion.

Now, the Government's position, I think, would be a more
compelling position if there was a significant time
differential.  Say, for example, the first check is run at
2203:01 and the second check is run an hour later and at a
different station.

But to the extent that all of these entries that we've
identified as overrepresentative here are situations similar
to this, where you have a very, very short window and in all
other respects the information is identical, then it's our
position that consistent with the language in the guideline,

being intended loss as opposed to attempted loss, that the amount should be reduced accordingly based on the multiple runs of the check.

And we've done this. Our position and what we've set out in our papers does this only for those entries that are close in time, but otherwise identical. So you're talking about within a minute or so of each other. Those are the ones that are redacted.

So we would submit, Your Honor, that consistent with the guideline approach with respect to intended loss, that the amount of attempted checks submitted at Exhibit C is overrepresented in the amount of $35,401.15.

THE COURT: Where is that amount listed in this line? This entry.

MR. FRENSLEY: The amount on Entry 12? It's where it says *Face Amount*. It's the fourth column.

THE COURT: Okay.

MR. FRENSLEY: And you can see again No. 12, 597.13. No. 13, 597.13.

THE COURT: Okay. 597? Is that what that is?

MR. FRENSLEY: They're identical in all regards except for that time. And the time in this particular example is five seconds apart.

THE COURT: Okay.

MR. FRENSLEY: Now, Your Honor, I know that the

1    exercise is tedious.  But it's significant in this case, Your

2    Honor.

3        It's significant in this case because, again,

4    determining the guidelines with respect to the amount of loss

5    has a significant effect on the guideline calculation in this

6    case.  And I would submit that --

7        You know, the guidelines talk about precision.  They

8    talk about how, you know, it needs to be a reasonable

9    estimate.  But I would submit that you have to hold that up

10   against the well-established law in the Sixth Circuit that

11   they can't -- it can't be based on speculation and the

12   Government does have some burden of proof here.

13       And I would submit that the cases that talk about a

14   reasonable estimation talk about within a range.  And so with

15   respect to these items, whether Your Honor were to accept our

16   loss calculations or to accept the Government's loss

17   calculations, with respect to the additional items and the

18   arithmetic error that I indicated, it becomes significant.

19       Because either way, if Your Honor agrees with either of

20   those arguments, what it does is it reduces the amount of

21   loss to under $200,000.

22       If Your Honor agrees with the calculation that the

23   defendant set forth, that amount is $181,746.25.  And I

24   apologize.  I haven't done the math on the Government's loss.

25   It's probably around $190,000.  There's a difference --

1          If Your Honor accepts our intended loss argument and

2     accepts the amount that I've indicated with respect to the

3     Government's amount, it still falls below the $200,000

4     threshold, which is the breaking point for the guideline

5     calculation.

6          So with respect to the loss amount, Your Honor, again

7     even --

8               THE COURT:  Is that the only intended loss item you

9     have quarrels with?

10              MR. FRENSLEY:  I'm sorry?

11              THE COURT:  You're on the intended or attempted

12    cash cashing.  That's where we are.  You've pointed me to

13    Items 12 than 13.

14         Do you have other complaints?

15              MR. FRENSLEY:  Yes, Your Honor.

16         With respect to those, those are set forth in the

17    position paper.  And I can go through the numbers there.

18         At Page 3 of my position paper that I filed, Your

19    Honor --

20              THE COURT:  Right.

21              MR. FRENSLEY:  -- it sets forth the entries.

22              THE COURT:  At the top.

23              MR. FRENSLEY:  There are a significant number of

24    those.  I can -- I'm certainly happy to, if the Court would

25    like me to go through each one.

1       It's that same scenario.  It's either an issue of

2 duplication or, you know, transactions within a very, very

3 short time period of each other.  And the total amount for

4 those is $35,401.15.

5       Would Your Honor like me to take you through each of

6 those that I've identified?

7          THE COURT:  I don't think so.  We would be here

8 until the afternoon.

9          MR. FRENSLEY:  I understand, Judge.

10         THE COURT:  Okay.  Anything else on the loss?

11         MR. FRENSLEY:  That's the issue on the loss.

12         THE COURT:  Okay.  Let's hear from the Government.

13         MR. HOWARD:  Your Honor, I think the key -- the key

14 phrase in the guidelines or the key task for the Court is to

15 determine a reasonable estimate.  A reasonable estimate of

16 the loss in this case.

17       And what I would like to do, with the Court's

18 permission, is call the agent who is the primary author of

19 the data that appears in the spreadsheets and have him give

20 some testimony regarding how it was reached.  And then I will

21 continue with my remarks, if I may.

22         THE COURT:  Okay.

23         MR. HOWARD:  The Government would call Agent

24 Matthew Stevenson.

25         THE COURT:  Raise your right hand, please.

1                              (Oath administered.)

2              THE COURT:  Okay.

3                         MATTHEW STEVENSON

4         called as a witness, having been first duly sworn, was

5         examined and testified as follows:

6                        DIRECT EXAMINATION

7    BY MR. HOWARD:

8    Q.   Agent Stevenson, where do you work?

9    A.   The U.S. Secret Service.

10   Q.   Are you familiar with the case involving James C.

11   McWhorter?

12   A.   Yes, I am.

13   Q.   Have you been one of the primary agents on that case

14   for --

15   A.   The last two years.

16   Q.   And are you familiar with the spreadsheets that we've

17   been referring to today as Exhibit A, Exhibit B, and Exhibit

18   C?

19   A.   Yes, sir.

20   Q.   Have you worked with various stores, Wal-Mart and

21   others, and other investigators, in trying to marshal the

22   data that appears in these spreadsheets?

23   A.   Yes, sir, I have.

24   Q.   I want to walk through those in, hopefully, a methodical

25   manner.

1          I'm going to start with Exhibit A, which is the summary

2     sheet.  It has a series of stores listed and some totals at

3     the bottom.

4          Do you have that document in front of you?

5     A.   Yes, sir, I do.

6     Q.   The first line entry there refers to the victim

7     Wal-Mart.  I'm going to leave that to one side for the moment

8     and focus on the other stores listed below there.

9               THE COURT:  All right.  Excuse me.  Is this

10    Document 487-1?  I'm trying to --

11         Mine is not marked with an exhibit number that I see, so

12    I'm trying to identify which sheet you're --

13              MR. HOWARD:  It is the first exhibit to the

14    Government's *Sentencing Memorandum*.  So it should be --

15         With ECF, Your Honor, it should be stamped -1 at the

16    bottom.

17              THE COURT:  Well, mine says Document 487-1 at the

18    bottom.  It's the one where you have a total actual loss,

19    total from attempted passes at Wal-Mart.

20              MR. HOWARD:  Yes.  I believe 487 is the document

21    number for the memorandum.  And then the -1 refers to the

22    first exhibit; -2 would be the second exhibit.

23              THE COURT:  All right.

24              MR. HOWARD:  I refer to them in my memorandum by

25    letter, but yes.

```
 1                    THE COURT:  That's A.

 2                    MR. HOWARD:  Correct.

 3                    THE COURT:  Okay.

 4      Q.   (By Mr. Howard)  Focusing on the stores and the entities

 5      that appear below Wal-Mart, where did the information for the

 6      actual loss for those stores come from?

 7      A.   This was a cumulative effort from local police

 8      departments who responded to these stores at the given time

 9      and actually recovered the check from these stores.

10      Q.   So for the losses that are intended, is there an actual

11      recovered check that some local law enforcement agency

12      obtained?

13      A.   Yes, there is.

14      Q.   Do those numbers --

15           Again, for those local stores, what I'm referring to as

16      local stores, does that reflect any intended loss or

17      attempted loss?

18      A.   No, sir.

19      Q.   Why not?

20      A.   To my knowledge, the local stores did not contract with

21      Certegy, as in the example of Wal-Mart, who actually tracked

22      some of those checks.

23           In addition, it doesn't take into the fact that local

24      stores had no process or means for tracking checks that were

25      declined.
```

1    Q.   So, for example, the first local store listed there is

2    Smithville Foods.  Had there been a check and the defendant

3    or one of his co-conspirators tendered the check to cash at

4    Smithville Foods but was not successful, would that be

5    reflected here?

6    A.   No, sir.

7    Q.   Now, you stated that the information here came from some

8    local law enforcement agencies; correct?

9    A.   Correct.

10   Q.   As the Secret Service agent overseeing the broader

11   federal investigation, did you have to rely on the police

12   work of some of these local agencies?

13   A.   Yes, I did.

14   Q.   And so if a check had been successfully passed at a

15   local store and had been reported to the local police, but

16   that local police department, for whatever reason, didn't

17   connect it with this investigation, would you have known

18   about it?

19   A.   No, I would not.

20   Q.   And, I guess, in the same respect, if they never

21   reported it to the local police, you wouldn't have learned

22   about it either.

23   A.   Correct.

24   Q.   So the figures that appear for those local stores, below

25   Wal-Mart, reflect only the recovered actual checks that were

1    cashed at those stores?

2    A.   Yes.

3    Q.   Let's turn then to Wal-Mart, which the total appears

4    there at the top.  $85,819.94.  But the detail data appears

5    in the second spreadsheet referred to as Exhibit B, but which

6    is likely 487-2 for the Court.

7        I want to talk about how that spreadsheet was developed.

8    Is it fair to say that it was a several-step process?

9    A.   Yes, sir, it was.

10   Q.   Let's talk about that.

11       How did that process begin?  How did you -- how did the

12   data that eventually formed this spreadsheet first come into

13   life?

14   A.   Again, it was a cumulative effort from local police

15   departments.  As they gained suspect data or information,

16   they just compiled a big sheet -- a spreadsheet, per se -- of

17   that information; and, in turn, submitted all that

18   information collectively to Wal-Mart, whether it, in fact,

19   included information pertaining to McWhorter or somebody else

20   outside the investigation.

21   Q.   When did that initial submission to Wal-Mart occur?

22   A.   Sometime in early 2006.

23   Q.   Were all the details and all the components of the

24   conspiracy as charged in this case -- were they known in

25   early 2006?

1    A.   No, sir.  They were not.

2    Q.   And that submission --

3    Did the Secret Service make that submission?

4    A.   No, sir.  We did not.

5    Q.   That was done by local police?

6    A.   Yes, it was.

7    Q.   And as a result of that information, what did Wal-Mart

8    do with that information, as you understand it?

9    A.   As a result, they queried the database that they had in

10    place, with the MICR line or the account and banking

11    information, and cross-referenced their system with the data

12    presented by local police departments, to come up with a

13    spreadsheet which they based or thought contained some

14    information that might be pertinent to the investigation.

15    Q.   Again, this is that 2006 time frame?

16    A.   Yes, sir.

17    Q.   And the total of that original inquiry, the total of

18    that first spreadsheet, was this number in the range of

19    $280,000 or $275,000?  Is that about right?

20    A.   274, I believe.  Yes, sir.

21    Q.   And, again, that reflected strictly actual loss?

22    A.   Yes, sir.

23    Q.   That didn't have anything to do with intended loss or

24    attempted loss?

25    A.   No, sir.  At that time Wal-Mart did not actually track

1    attempted passings.

2    Q.   So we have this 2006 spreadsheet with a loss.  The

3    actual loss is estimated around $275,000.

4         Did you then take some steps much later in the

5    investigation to refine that information?

6    A.   Yes, I did.

7    Q.   Walk the Court through what you did to refine that

8    information, to make it more reliable.

9    A.   I created several different spreadsheets, of which the

10   information contained in the spreadsheets were driver's

11   license information, the names on the checks, alias and

12   genuine names used.

13        There were several different categories, to include

14   dates of birth and Social Security numbers that we identified

15   throughout the investigation.

16        And, again, backtracking here a second, it was a

17   collective effort from reviewing every piece of paper or

18   document that we obtained during the investigation, taking

19   that information and instituting that into a spreadsheet to

20   further be able to verify the information, for example, with

21   the Wal-Mart spreadsheet, and cross-check that information.

22        And, again, we just created several spreadsheets of

23   information that we actually physically obtained during the

24   investigation from local police departments, from local

25   merchants, from Wal-Mart, and such.

1    Q.   So let's just use the example of one check, so we're

2    clear.  One check that you would have seized in the

3    investigation.

4         What type of information on that check did you use to

5    cross-reference against the Wal-Mart database?

6    A.   I have one of the spreadsheets in front of me.

7         For example, the name of the check in this example would

8    be Amy Cannon.  It contained all the MICR line information,

9    the routing number and bank account number, the bank that it

10   was styled on.  Meaning, in this example, it would have been

11   Bank of America.  The amount, the address written on the

12   check.

13        And if it had a Social Security or driver's license

14   number or any other particular identifier on that check, I

15   put that into a database.  And then I cross-referenced it

16   with where I actually had obtained the data from.

17   Q.   So one of the many fields you just mentioned that was

18   cross-referenced against the data that Wal-Mart provided?

19   A.   Yes, sir.

20   Q.   And did that process then result in an early version of

21   the spreadsheet that we're referring to as Exhibit B or

22   Exhibit 2?

23   A.   Yes, sir.

24   Q.   Was the process you just described difficult?

25   A.   Yes.  It was very time intensive.

1    Q.   How so?

2    A.   It took, collectively, probably about three months to

3    incorporate all the data.

4         If you physically break down the time, probably

5    somewhere close to three weeks of actual day in and day out

6    time to make sure that the information I had inputted and the

7    spreadsheets I created cross-referenced somehow with the

8    spreadsheet that Wal-Mart created.

9    Q.   Do you think it's perfect?

10   A.   No.

11   Q.   Why not?

12   A.   There's potentially several instances where we did not

13   actually obtain checks or Certegy or Wal-Mart or local law

14   enforcement may not have obtained a particular check from a

15   particular co-defendant.  Or it could very well be that we

16   did not obtain that particular alias name or that particular

17   address of a check that was cashed from a local merchant.

18   Q.   Did the sheer amount of data that a large retailer like

19   Wal-Mart has present any logistical problems?

20   A.   Yes, it did.

21   Q.   Was the process cumbersome?

22   A.   Yes, it was.

23   Q.   I want to talk then --

24        Again, staying with Exhibit B or Exhibit 2, there are

25   certain highlighted rows.  Did those highlighted rows have

1    some field, some information, that matched with information

2    that was on a check that was seized in the investigation?

3    A.    They did.

4    Q.    Do you recall at --

5          Let's focus on the first seven that are on the first

6    page.  What field matched there?

7    A.    If you'll scroll over to the top of the category that

8    says ABA, the 644000266 number corresponds with additional

9    checks that were recovered in the investigation.

10   Q.    Nonetheless, the highlighted rows have been removed

11   because of the date range; is that right?

12   A.    Yes, sir.

13   Q.    And how do you account for why they appeared there in

14   the first place?

15   A.    Strictly because it referenced a piece of information

16   that I had instituted in the spreadsheets that I created.  In

17   this example, the ABA number.

18   Q.    So despite that ABA number matching, did you take a

19   further step to refine it and double check it with the

20   database?

21   A.    Yes, sir.

22   Q.    And is the same process true, there are a few that have

23   been removed because they were cashed in certain other

24   places?

25   A.    Yes, sir.

1    Q.   Now, one of the things that was raised by Mr. Frensley

2    is that there are certain ones --

3        I'll refer to one example.  Lines 24 and 25, at least,

4    appear to be duplicitous or largely duplicitous of each

5    other.  I want to ask you about that.

6        From the items that were seized or recovered from local

7    law enforcement or found on the defendant's computer, were

8    there multiple copies of the same check?

9    A.   Yes, sir.  There were multiple copies of the same check

10   that had identical information throughout.

11            THE COURT:  Now, does that mean that those

12   duplicate copies were cashed --

13            THE WITNESS:  No, sir.

14            THE COURT:  -- at the same store twice?

15            THE WITNESS:  It's a possibility, but it does not

16   definitively mean that.  No, sir.

17            THE COURT:  Pardon me?

18            THE WITNESS:  There's a possibility that could have

19   been, but it's not a definitive answer that it was cashed.

20            THE COURT:  But you heard Mr. Frensley identify

21   specifically this Item 24 and 25.  It's a check in the amount

22   of $498.64.

23            THE WITNESS:  Yes, sir.

24            THE COURT:  Supposedly, both checks were cashed on

25   3/6/06, in Nashville.  The same store.  Apparently, Store

1    No. 688.

2        What do you make of that?

3        THE WITNESS:  Like I said, sir, several of the

4    pieces of information that we recovered show that there are

5    multiple checks that had the same identical information.

6        The reason I would have left it in the spreadsheet is

7    because I cannot define if it was just, in this example,

8    McWhorter or one of the other co-defendants alongside him in

9    the store.

10       There's a good possibility that there were multiple

11    people at the same location, at the same time, attempting to

12    pass checks.  That's the reason I left it in there, solely

13    based on that purpose.  Whether they put it in there once,

14    twice, three, or four different times.

15       THE COURT:  Well, for this one would you find it

16    unusual, though, that at the same store they're passing a

17    check from Mario Gray -- two checks from Mario Gray in the

18    same amount of money at the same store?

19       THE WITNESS:  I personally would not, because we

20    found multiple checks that contained the same name, the same

21    MICR line information, the same check number, throughout the

22    investigation.

23       My philosophy or my thought was that you could have had

24    at least two different offenders, co-defendants, in the store

25    at the same time, attempting to pass the same check.

1          THE COURT:  You say they had the same identifiers.

2     They would have to have different pictures, wouldn't they?

3          They had photographs to go with the driver's licenses.

4          THE WITNESS:  Yes, sir.

5          THE COURT:  And if they had a different person,

6     they would have to have a different picture.

7          THE WITNESS:  Yes, sir.

8          THE COURT:  So that wouldn't be the same

9     identifier.

10          THE WITNESS:  In that example, yes, sir.  Correct.

11     The same identifier on the check is what I'm referring to.

12     The same --

13          They could have very well used the same ID.  They very

14     well could have used the same Social Security number and so

15     forth.  But the picture, obviously, would have --

16          THE COURT:  Had a different picture?

17          THE WITNESS:  It would have varied.

18          THE COURT:  This doesn't show what time.  I guess

19     if you had a different photo ID, if it was a driver's

20     license, you could do one in the morning and one in the

21     afternoon.

22          THE WITNESS:  Yes, sir.

23          THE COURT:  Okay.  Go ahead.

24          THE WITNESS:  I have a bit of a different entry,

25     too, on the account numbers on 24 and 25.  I don't know if

1      mine is cut off or not, but it appears that there are

2      different account numbers written on my sheet.

3                    THE COURT:  Is that under the column ACCT?

4                    THE WITNESS:  Yes, sir.

5                    THE COURT:  Aren't they both 64000046?

6                    THE WITNESS:  Under the account number, on Line

7      Item No. 24, you have 100000164.  And then directly

8      underneath that you also have 10770.

9          If you look at Line 25 -- maybe it's just cut off on my

10     copy -- I have 1000001641.  I do not have the 0770 portion of

11     that account number.

12                    THE COURT:  I see.  I was one column over from you.

13     I see what you're saying.

14          Okay, Mr. Howard.

15     Q.    (By Mr. Howard)  In response to the Court's questions,

16     you mentioned your philosophy of why you did what you did in

17     these spreadsheets.

18          Did you have to make certain judgments in what to

19     include, what not to include, and how to format these?

20     A.    Yes, I did.

21     Q.    And why wasn't it just obvious, the way to do it?

22     A.    Well, I think given the circumstances of what we found

23     through the investigation, it was not necessarily clear to me

24     that if we found multiple checks with the same identifiers

25     throughout the check -- it was not clear to me that one

1    person went into one store on a given day, at a given time,

2    and attempted to cash that check.

3    Q.   But even more broadly than that.  Not with just the

4    duplicate check issue, but just more broadly.

5         Did you have to make certain judgments?

6    A.   Yes.

7    Q.   And my question was:  Why wasn't it just obvious, the

8    one way to do this?

9         Was there a lot of data?

10   A.   There is quite an extensive amount of data throughout

11   the investigation.

12   Q.   Let's leave actual loss now and turn to intended loss,

13   which is reflected in -- I'll refer to it as Government

14   Exhibit C, which is likely No. 3 on the Court's copy.

15        The information in Exhibit C.  Where did that come from?

16   A.   That came from a company called Certegy.

17   Q.   And what is Certegy?

18   A.   Certegy is a check verification system company that

19   Wal-Mart is contracted through.

20   Q.   And what does Certegy do?

21   A.   They keep up with checks that are passed and attempted

22   to be passed through -- in this case contracted through

23   companies like Wal-Mart.

24   Q.   Did you talk to analysts or investigators with Certegy?

25   A.   I did.  I spoke with an analyst by the name of Al

1    Pascual.

2    Q.   Is it your understanding whether Certegy captures every

3    single attempted check -- every check attempted to be passed

4    at Wal-Mart?

5    A.   They do not.

6    Q.   Just a portion of them?

7    A.   Yes, sir.

8    Q.   And with the information provided by Certegy --

9         Well, let me ask it this way.  What information did you

10   give to Certegy for them to create this?

11   A.   I gave them the same spreadsheets that we referred to

12   earlier.  That included the MICR line information, the names

13   on the checks, the identifiers that we had recovered from

14   this investigation.

15   Q.   In speaking with people from Certegy, do you know if

16   they were able to use all of that information to

17   cross-reference against their database, or only some of it?

18   A.   Just a portion of it.

19   Q.   And what was the portion?

20   A.   Driver's license and Social Security number.

21   Q.   So if there was a check passed by one of the defendants

22   in this case that had one of the known bank account numbers,

23   the MICR line information, known to be fraudulent, known to

24   be in this case, but didn't have a Social Security number or

25   driver's license number, would it be reflected in Exhibit C?

1    A.   It would not.

2         MR. HOWARD:  Your Honor, those are the questions I

3    have for Agent Stevenson.  I don't know if Mr. Frensley has

4    cross examination.  I do have some more argument to make.

5         THE COURT:  Okay.

6                        CROSS EXAMINATION

7    BY MR. FRENSLEY:

8    Q.   Agent Stevenson, with respect to Exhibit A, you

9    described the process for determining that amount.

10        Isn't it true that one of the reasons why local stores

11   or smaller operations are often targeted in actions like this

12   is because they're less likely to be rejected at those

13   places?

14   A.   I don't know about less likely to be rejected, but they

15   typically require less identifiers.

16   Q.   Right.  So less identifiers would mean more likely to be

17   accepted; right?

18   A.   Sure.

19   Q.   And isn't it true that in your investigation of this

20   matter you were able to ascertain and develop an

21   understanding about the types of safeguards or systems that

22   Wal-Mart used that would enable you to collect this data?

23   A.   Correct.

24   Q.   And how did the information systems that Wal-Mart used

25   compare to these smaller operations?

1    A.    It's quite a bit more extensive.

2    Q.    Right.  And as far as any information with respect to

3    unsuccessful attempts to cash checks at any of these smaller

4    locations, you can't tell the Court about any single one

5    attempt, can you?

6    A.    That's correct.  Not unless it was in a local police

7    report.

8    Q.    Right.  So if you were to give a number or if there was

9    to be a number attributed to attempted checks at these local

10   stores, it wouldn't be anything more than a guess at this

11   point; right?

12   A.    Yes, sir.

13   Q.    Now, one of the other items that's listed on that

14   Exhibit A is an amount of loss to the Tennessee Department of

15   Correction.  Do you see that?

16   A.    Yes, sir, I do.

17   Q.    You're familiar with what that loss is about; right?

18   A.    Yes, sir.

19   Q.    And those were payroll checks drawn off the accounts of

20   the Tennessee Department of Correction?

21   A.    Yes, sir.

22   Q.    Okay.  Those payroll checks were cashed somewhere,

23   weren't they?

24   A.    Correct.

25   Q.    Isn't it true that those TDOC checks were cashed at

1    Wal-Mart?

2         Didn't your investigation reflect that the TDOC checks

3    were cashed at Wal-Mart?

4    A.   I don't recall specifically, off the top of my head.

5    Q.   Do you recall where they were cashed?

6    A.   No, sir, I don't.

7    Q.   Okay.  If they were cashed at Wal-Mart, then that loss

8    to the TDOC would be reflected again in the loss to Wal-Mart,

9    wouldn't it?

10   A.   Right.  Assuming they caught the check, yes, sir.

11   Q.   Well, assuming that that check was a payroll check that

12   was in the spreadsheet; right?

13   A.   Right.  Assuming they used one of the identifiers that

14   they had given them at the time.

15   Q.   Assuming that one of those payroll checks was cashed at

16   one of those local stores, then it would be reflected in the

17   loss to the local store; right?

18   A.   As long as we found the check.  Yes, sir.

19   Q.   So to the extent that the TDOC checks are reflected

20   either in the Wal-Mart loss or the local check loss, then

21   that 7,000 plus dollars is counted twice, in effect; right?

22   A.   I would have to go through the spreadsheet.  I don't

23   know that it's in the Wal-Mart spreadsheet.

24   Q.   But if that's the case, then you have an overstatement

25   by $7,000 plus ; right?

1    A.   Yes.

2    Q.   Okay.  Let's talk about the Wal-Mart documentation that

3    you described here.

4         I asked you a question earlier about some of the systems

5    that Wal-Mart has in place.  Isn't it true that one of the

6    systems --

7         I think I remember somebody testifying at trial that

8    Wal-Mart had a limit on the amount of money that you could

9    cash in a check.  Isn't that right?

10   A.   Yes, sir.

11   Q.   Okay.  So you couldn't cash more than a certain amount

12   of checks at Wal-Mart over a given time; right?

13   A.   I think that was my understanding, yes.

14   Q.   Do you remember, wasn't it --

15        It was either $1,000 a week?  Wasn't that the number

16   that you have a recollection of?

17   A.   I don't recall the number off the top of my head.

18   Q.   Okay.  But there was a number that you couldn't exceed

19   at Wal-Mart for a given individual; right?

20   A.   I think it was --

21        I think it was on a per day basis.

22   Q.   Okay.  But you don't recall that per day basis being

23   $1,000 per day?

24   A.   No, sir.

25   Q.   Okay.  Now, isn't it also true that one of those systems

1  that Wal-Mart has in place won't allow for the cashing of a

2  duplicate check?

3  A.    I'm not sure on that.

4  Q.    Okay.  You don't think that if somebody tries to cash

5  the same check once, it goes through, and then you try it

6  again, it's not going to somehow raise a flag or otherwise

7  not be accepted by the system?

8  A.    No.  That's not my understanding of it.

9  Q.    Your understanding is that they can run a check through,

10  cash it, and then run that same check through again and cash

11  it again?

12  A.    Well, my understanding is the way they do it is it reads

13  the MICR line information.  If the information is correct and

14  valid, then they make an effort to cash the check.

15  Q.    So you really think that at Wal-Mart if they run a check

16  through and it's accepted, they pay you the money, they can

17  take that same check, run it through again, it would be

18  accepted again and they would pay the money again?

19  A.    Not the same check.  But if they presented a new check

20  with the same information on it, I believe that's probably

21  distinctly possible.

22  Q.    Okay.  Were you able to recover actual checks from

23  Wal-Mart?

24  A.    No.

25  Q.    Okay.  Only the data behind the information that you put

1    together?

2    A.   Yes, sir.

3    Q.   Now, with respect to this entry that was described here

4    at Items 24 and 25, the Mario Gray entry.  My copy was

5    redacted, so I'm not sure about that account number issue you

6    were --

7              THE COURT:  Which exhibit is this?

8              MR. FRENSLEY:  Exhibit B, Your Honor.  Entries 24

9    and 25.  The Mario Gray check.

10        Now --

11                        (Document handed to counsel.)

12             MR. FRENSLEY:  Okay.

13   Q.   (By Mr. Frensley)  Now, you testified that you left

14   these two items in, even --

15        Well, you'll agree with me that across the spreadsheet,

16   with the exception of that issue that you described regarding

17   the account number, that these appear to be identical; right?

18   A.   Yes, sir, they do.

19   Q.   Okay.  And so you said that the reason that you left

20   them in was because it's possible that it could have been two

21   people cashing the same check at the same time.

22        Is that what your theory for leaving that in is?

23   A.   I don't know about the same time, but definitely within

24   a pretty close proximity.

25   Q.   Okay.  And these don't have -- like the attempts that we

1  have, these don't have a time when they were cashed on them,

2  do they?

3  A.   No, sir.

4  Q.   All right.  I just wanted to make sure that wasn't on a

5  copy that I didn't have.  Okay.

6       So other than that possibility, you don't have any

7  information to refute that these are duplicate entries of the

8  same transaction?

9  A.   No, sir.  I don't.

10  Q.   Now, you testified a little bit about the process and

11  about how time consuming it was and the efforts that were

12  made.  But you don't regret --

13       You don't disagree that the numbers have continued to

14  significantly decrease over time; right?

15  A.   Yes, sir.

16  Q.   And that's because it is clear that there were items

17  that were included at various points in time that were not

18  attributable to this conspiracy; correct?

19  A.   Yes, sir.

20  Q.   And the reason for that is because initially you tried

21  to cast the web or the net as wide as it possibly could be;

22  correct?

23  A.   Yes, sir.

24  Q.   And as a result, it captured things that weren't related

25  in any way whatsoever to this conspiracy; correct?

1    A.   Yes, sir.

2    Q.   And it's likewise possible, given the type of

3    identifiers that you talked about that link things, that

4    there are still items included here that aren't attributable

5    to this conspiracy; correct?

6    A.   There's a possibility.  Yes, sir.

7    Q.   Okay.  Now, you said you prepared these spreadsheets?

8    Or did somebody else do it?

9    A.   The Wal-Mart spreadsheet that you see in front of you

10   and the Certegy spreadsheet were a combination of their

11   efforts.

12   Q.   So they just gave it to you?

13   A.   Correct.

14   Q.   In this format; right?

15   A.   Correct.

16   Q.   So with respect to my addition of the various fields,

17   you don't --

18       Do you have a position?  Do you know whether the numbers

19   that are reflected are accurate or not?

20   A.   In the spreadsheets that you see today, I believe that

21   those are the most accurate figures.

22   Q.   But do you recall earlier, when I was going through the

23   objections, I indicated that it was my belief that the

24   highlighted areas weren't properly added, that the number

25   wasn't correct?

1          Do you know one way or the other about the numbers?

2     A.   I heard your argument this morning.  Yes, sir.  And it's

3     definitely outside of the time parameter that the conspiracy

4     happened.  At least Items No. 1 through 7 were.

5     Q.   I'm speaking just of the math.

6          Do you know?  Did you ever double check their math in

7     any respect?

8     A.   Yes, I did.

9     Q.   Am I right?  Is that number wrong for the highlighted

10    areas?

11    A.   Without going back through it with a calculator, I'm not

12    sure.

13    Q.   That's fine.

14         Now, with respect to the attempted loss.  You testified

15    that Certegy doesn't capture all of the checks that are

16    passed at Wal-Mart; right?

17    A.   Correct.  That's what I was told.

18    Q.   What you were told is that what they capture is payroll

19    checks passed, not personal checks; correct?

20    A.   Correct.

21    Q.   Okay.  But they do, in that sense, capture the payroll

22    checks that are cashed there; right?

23    A.   Most of them.

24    Q.   Okay.

25    A.   Not all of them.

1    Q.   Okay.  And in this particular case, based upon your

2    investigation and all your work with the various matters, the

3    checks that were passed at Wal-Mart were, in fact, payroll

4    checks; right?

5    A.   It appears most of them are.  Yes, sir.

6    Q.   Yes.  They didn't pass personal checks at Wal-Mart;

7    right?

8    A.   Not that I can tell.

9    Q.   So of the payroll checks that were passed, those were

10   the kinds of items that were specifically captured by

11   Certegy; right?

12   A.   It would appear so.

13   Q.   Okay.  Now, I may have misunderstood this or misheard

14   you.  But I guess my question is, you've testified that you

15   heard my argument earlier with respect to the duplication of

16   entries on this; correct?

17   A.   Yes, sir.

18   Q.   And specifically, like for example at Spreadsheet C,

19   Lines 12 and 13, those are --

20        That's the example I used with the Court.

21   A.   Yes, sir.

22   Q.   Do you have a position, with respect to the philosophy

23   that you utilized, as to why you believe that these are

24   multiple unrelated attempts, as opposed to attempts within

25   five seconds that were just the same check being attempted to

1     be run through by the cashier?

2     A.   No.  Only what I alluded to earlier as a possibility.

3           It's also a possibility that you're correct.  It could

4     have been that the cashier ran it through at the same time.

5     But I had information that suggested --

6           Because we found so many checks that were identical in

7     nature, duplicates of so many checks that were identical in

8     nature, I had to include the possibility that there were

9     multiple people in the store attempting to cash the checks.

10    Q.  So as you sit here today, you don't have any evidence to

11    support your theory that these are attempts made by different

12    people, different situations; right?

13    A.   No, sir.

14    Q.  And you think that my explanation is just as probable as

15    what you've suggested; right?

16    A.   Yes, sir.

17               MR. FRENSLEY:  If I could have just a moment, Your

18    Honor.

19                      (Discussion held off the record.)

20    Q.  (By Mr. Frensley)  You were talking about why it is that

21    you used that philosophy.  And you discussed about finding

22    these duplicate checks.

23           So I understand that during the course of the

24    investigation, you found duplicate checks; right?

25    A.   Yes, sir.

1      Q.   And isn't it true that with respect to those duplicate

2      checks that the reason they were duplicated is because there

3      were problems with the various checks?

4          In other words, there might be an issue with the MICR

5      information, there may be an issue with the formatting or

6      something like that.  Isn't that correct?

7      A.   I have no way to verify that.  The checks looked

8      identical in every facet to me.

9      Q.   In the course of your investigation did you find any

10     situations where there were two identical-looking checks that

11     were actually cashed?

12     A.   I don't believe so.  No, sir.

13              MR. FRENSLEY:  That's all I have, Judge.

14              THE COURT:  Anything further, Mr. Howard?

15              MR. HOWARD:  Not with the witness, Your Honor.

16              THE COURT:  Okay.  Thank you.

17                              (Witness excused.)

18              MR. HOWARD:  May I have one minute to talk with

19     Mr. Frensley?

20              THE COURT:  Yes.

21                      (Discussion held off the record.)

22              MR. HOWARD:  Thank you, Your Honor.

23         Before I turn to my overall remarks, what I was

24     conferring with Mr. Frensley about was one of the issues was

25     just a strictly arithmetic issue with the highlighted rows.

1    Leaving aside Mr. Frensley's objections about other ones,

2    just whether there was an arithmetic factor.

3         I asked a paralegal in my office to recalculate those.

4    I feared that maybe there was an error in the formula.  There

5    was.  And so for the highlighted portion, the arithmetic

6    portion of it, I agree that those highlighted portions add up

7    to --

8              THE COURT:  Now, are you on Exhibit B?

9              MR. HOWARD:  I'm on Exhibit B, yes.

10        If you add up the highlighted portions that the

11   Government agreed to deduct, there was an arithmetic error.

12   And the total of the highlighted rows, which includes Rows 1

13   through 7, Row 30 and 31, Row 141, and then Rows 144 through

14   156, the total of those highlighted rows --

15             THE COURT:  Give me those again.  30, 31.  What was

16   the next one?

17             MR. HOWARD:  141, and then 144 through 156.

18        The total of those highlighted rows is $12,047.02.

19   Deducting that from the $96,000 that was the original total,

20   the new total, and what the Government suggests is the --

21   maintains is the actual loss to Wal-Mart, is $84,096.38.

22   $84,096.38.

23        And for what it's worth, Your Honor, because I didn't

24   ask him on the stand, that portion of the arithmetic done

25   was, unfortunately, done by my office, not by Agent

1    Stevenson.  So any criticism of one's math falls to me.

2              THE COURT:  So the parties agree, is this correct,

3    as to the actual loss it's $84,096.38?

4              MR. HOWARD:  I'll let him speak for himself.  I

5    think Mr. Frensley suggests there were other deductions, as

6    well.

7              THE COURT:  All right.  Mr. Frensley.

8              MR. FRENSLEY:  That's correct, Your Honor.

9         We believe that there should be an additional $1,800.27

10   deducted.  And those are the items that I went through with

11   the Court.

12             THE COURT:  And that's the total of those

13   additional items that you pointed out?

14             MR. FRENSLEY:  That's correct, Your Honor.

15             THE COURT:  Okay.  Now, that's all as to the actual

16   loss.

17        Now, as to the intended loss.  Mr. Frensley, you

18   identified several that were duplicates.  The Government's

19   position as to that was 118,064.89.  And you have identified

20   from Exhibits B and C, what I added, another 2,397.

21             MR. FRENSLEY:  Your Honor, it was $35,401.15.  That

22   was the total of the items --

23             THE COURT:  I'm talking about your intended loss.

24             MR. FRENSLEY:  Right, Your Honor.

25             THE COURT:  Okay.  We didn't talk about all those.

1    Those that we talked about, I think, if I calculated them

2    right, it was like $2,400.

3              MR. FRENSLEY:  That's right, Judge.

4              THE COURT:  But in your paper you say there were

5    these others --

6              MR. FRENSLEY:  Right.

7              THE COURT:  -- that added up to $35,401.15.

8              MR. FRENSLEY:  That's right.

9              MR. HOWARD:  As this recent colloquy indicates,

10   we've spent a fair amount of time in minutia the last 45

11   minutes or so.

12        What I would like to do is step back and go to what I

13   think the fundamental task before the Court is, which is to

14   determine not whether Line 147 is in or out because of this

15   judgment or that judgment, but the Court's task is what is a

16   reasonable estimate of loss.  What is the reasonable estimate

17   of loss?

18        These spreadsheets, Exhibits A, B, and C, and all the

19   lines on there, are one tool, but only one tool, that the

20   Court has.  It's one piece of evidence that the Court has to

21   make that determination of what a reasonable estimate is, but

22   it's not the only one.

23        These, I think, are the product, as Agent Stevenson

24   testified, of a rather painstaking process that is, by any

25   account, difficult and imperfect.  But, again, it's not the

1    only evidence the Court has.

2        For example, the Court hs the defendant's own admissions

3    before it.  We highlighted in our memorandum the defendant's

4    early estimate of what the overall loss was was several

5    factors higher than this.  Over $3 million.

6        We also have co-defendants' admissions about the breadth

7    and the scope of this conspiracy.  More specifically, eight

8    other co-defendants came before this Court, pled guilty, and

9    pled guilty to an amount of loss over $300,000.  That is an

10    admission that, in their view, over $300,000 is a reasonable

11    estimate of loss.  And they were charged with that.

12        Since that time, again, there's been testimony now.

13    There's been refinements and more refinements to these

14    specific numbers.  But as we point out in our paper and as

15    Agent Stevenson testified, these are the ones that can

16    definitively be tied down.  Far beyond the level of proof

17    required, can definitively be tied down in terms of actual

18    loss.

19        And, as Your Honor heard, there is a very strong

20    likelihood that these are all underestimating.  In other

21    words, my fundamental point is this is a floor, not a

22    ceiling.  These spreadsheets are a floor, not a ceiling.

23        And when you factor in all this other evidence, when the

24    Court comes to --

25        Let me talk first about actual loss.  The actual loss

from the stores is not really in debate.  I think the numbers

for Wal-Mart are largely not in debate.  Largely not in

debate.  It's around $84,000.  If you subtract Mr. Frensley's

additional items, it's down to about $82,000.  Those numbers,

it seems to me, are largely not in dispute.

But again, a floor, not a ceiling, based on the other

evidence the Court has heard at the suppression hearing and

at the week-long trial and at the sentencing hearings and

other hearings of the co-defendants.

Turning to the intended loss.  There's been a great deal

of comment about the repetitious line items.  These quick

sort of serial cashing of what appears to be the same check.

The bottom line is we just don't know.  There is no way

to know for sure what has happened.  But what the guidelines

are intended to do with intended loss is it doesn't have to

be something that's even possible, it has to be what is

intended.

And the distinction here is if one defendant walks in

and tries to cash a check once -- a $500 check, let's say --

that intended loss -- and it's rejected, that intended loss

is $500.  But if he goes in and runs it four times, under the

other view it would be $2,000.

Now, I'm not -- the Government is not contending,

necessarily, that the $2,000 versus $500 is correct.  The

point is there's a quantum of -- a quantum of loss that

1    should be reflected in the greater conduct of the person who

2    tries it over and over again.

3         And the Court has certainly heard lots of testimony

4    about this ongoing refinement of the criminal scheme to try

5    to get Wal-Mart to cash these checks, to see what's working,

6    what's not working.  You know, whether we need this ID or

7    that ID.  What could it be?  And that, I think, is reflected

8    in the intended loss.

9         Leaving aside there's no intended loss for the local

10   stores; which, again, the evidence before the Court is there

11   almost surely were attempts.  Mr. Vincent, Mr. Hampton, and

12   Mr. Kennedy all testified regarding their efforts at these

13   stores.  And they certainly weren't all successful.

14        So I think in terms of actual loss, the $84,000 number

15   that we're talking about has been well established and is

16   largely -- is largely undisputed.

17        With respect to the intended loss -- again, using this

18   as only a floor, not a ceiling, there is still abundant proof

19   before the Court that the intended loss here is such that

20   when you combine the two, it's well over $200,000.

21        We've taken a conservative estimate on each one of

22   these.  And when those are combined with the admissions

23   before the Court and the testimony heard at trial, there's

24   more than adequate evidence to suggest that the amount of

25   loss -- a reasonable estimate of the amount of loss in this

1      case is between $200,000 and $400,000.

2                THE COURT:  Okay.  Anything further on loss?

3                MR. FRENSLEY:  Just briefly, Your Honor, if I may.

4                THE COURT:  Okay.

5                MR. FRENSLEY:  Your Honor, I must take issue with

6      Mr. Howard's remark that only what was calculated is what's

7      definitive.  I would say this is anything but.

8           And the Sixth Circuit has spoken on this issue, Your

9      Honor.  In *United States vs. Comer*, they've indicated that

10     the amount of loss can't be based on speculation.

11          You've heard the testimony of Agent Stevenson.  With

12     respect to the items that we have taken issue with, the only

13     basis the Government has for those numbers are their

14     speculation, their belief.  Their philosophy that well, you

15     know, it could have happened this way; so, therefore, we're

16     going to attribute it to the defendant.  And that simply

17     doesn't meet the burden that's been set forth by the Court.

18          Now, with respect to the numbers -- and, again, because

19     they're so significant, aside from the fact that the

20     Government has almost at every single step acknowledged the

21     inaccuracy of these numbers and acknowledged that it's just

22     as likely that they continue to contain information that

23     over-represents loss as opposed to under-represents loss, if

24     Your Honor accepts the number that the defendant has

25     submitted, then amount of loss, the total amount of loss, is

1      $181,746.25.

2          If Your Honor accepts the amount of loss that we went

3      through with the new spreadsheets that have been provided and

4      acknowledges the problem with the arithmetic, as well as the

5      additional $1,800, and then the intended loss issue that the

6      defendant has set forth, the Government's number is $197,200.

7          Under any scenario that puts --

8              THE COURT:  How did you get to that, Mr. Frensley?

9              MR. FRENSLEY:  That would be taking the actual

10     amount of loss, the --

11             THE COURT:  That's the $84,096.

12             MR. FRENSLEY:  And then subtracting the $1,800.

13     Those were the additional line items that I went through on

14     Exhibit B with Your Honor.

15             THE COURT:  Okay.

16             MR. FRENSLEY:  And then subtracting the $35,401.15

17     of duplicate entries in the intended loss, and then adding

18     all those numbers together.

19         Again, I would submit that that's --

20             THE COURT:  It's close to the $200,000 break-up,

21     but I'm wondering if we need to go over all your $35,000 of

22     what you say were duplicates.

23             MR. FRENSLEY:  I'm happy to do that, Your Honor.

24     As I indicated --

25         If I may get my papers.

1          THE COURT:  Now, I will say, from the trial I
2    remember that there were checks that were the same, except
3    they had different photographs on them.
4          MR. FRENSLEY:  That's right.  And I believe they
5    would have been passed at different locations, at different
6    times.  But again --
7          THE COURT:  But that's supposition, too.
8          MR. FRENSLEY:  I'm sorry, Your Honor.  I don't
9    follow that.
10         THE COURT:  Well, I mean, you're saying that you
11   have two people that come to Wal-Mart or some other store,
12   different names, different photographs.
13         MR. FRENSLEY:  Right.
14         THE COURT:  Maybe the same name, but it could be
15   different names, but different photographs to match whatever
16   the name is for the driver's license.
17       But it could be the same payroll check, the same
18   numbers, the same --
19         MR. FRENSLEY:  Exactly.  And I think that would be
20   reflected.
21       I mean, you have examples of that in the spreadsheet,
22   where you have the same name and the same check amount, but
23   it's at different stores or different times.  There are
24   plenty of examples of that throughout this information.
25       On Page 3 of my position paper, Your Honor, I set forth

1    the entries that I submit are duplicates --

2              THE COURT:  Right.

3              MR. FRENSLEY:  -- and are those items that are

4    within those very short windows on Exhibit C.

5        Again, I'm certainly happy to go through that with the

6    Court, if you think it would be helpful.  I'll represent to

7    the Court that I've reviewed those a number of times, that

8    those represent those situations, and that they equal up to

9    the $35,401.15.

10             THE COURT:  Well, we went over a few of those.  We

11   didn't go over all of them.

12       Have you gone over those, Mr. Howard?

13             MR. HOWARD:  Your Honor, I haven't gone over each

14   of those, the ones that Mr. Frensley is talking about, the

15   intended loss spreadsheet.

16       I will say this:  We're not disputing his math on those

17   particular line items or that they add up to $35,000.  I

18   don't think that's the dispute.  And I don't think that

19   really is -- especially the intended loss work.

20       In actual loss, that's down to the penny significant

21   because that goes into a restitution order.  Intended loss is

22   not going to go to any victim.  It's strictly a guideline

23   function.

24       The Court needs to determine is there sufficient

25   evidence based on the spreadsheet and all the other evidence

1    that the intended loss is such that it takes it within that

2    $200,000 to $400,000 range.

3        So our position is even if you accept that this $35,000

4    should fall out because of duplication, there's still

5    evidence based on the defendant's own admissions, the

6    co-defendants' admissions, and what we know generally about

7    the attempts of the ongoing conspiracy that makes it a very

8    reasonable estimate that the amount of overall loss, actual

9    and intended, falls within the $200,000 to $400,000 range.

10        I'm not disputing, for purposes of the individual line

11    items, that those add up to $35,000.  I just don't think

12    that's the Court's inquiry.

13        THE COURT:  Well, for guideline purposes, if you

14    consider the $35,400, it would put it just under $200,000, as

15    I understand it.

16        MR. HOWARD:  For the spreadsheet portion of the

17    proof.

18        THE COURT:  Right.  Well, you know, you point to

19    the defendant's testimony.  His testimony, I think, that you

20    point to is when he was being interviewed by the detectives

21    at the police department.  And I think he was portraying

22    himself in a bigger role than he actually assumed in this

23    whole conspiracy.  He was bragging.  At least that's my

24    recollection of that interview.

25        Now, are you talking about some testimony at trial?  You

1     may want to refresh my memory about that.  I don't recall him

2     testifying about the total amount of checks that they passed

3     and so forth, or intended to pass.

4         I do, however, think there is a distinction between

5     attempts and intended.  Because if you have one check that's

6     presented more than one time, it still represents one loss if

7     it hasn't been --

8         I mean, you're trying to get a certain amount of money.

9     That's the amount of money that's written on the check.  And

10    if you attempted it three times, that still doesn't change

11    the same amount of money you're trying to get.

12        You're just trying to get that kind of money, that

13    amount of money.  Maybe you don't have enough identification

14    or maybe your clerk is too wise, until you finally hit

15    somebody that doesn't raise the question and gives you your

16    money.  But that doesn't mean you multiple it by four.

17             MR. FRENSLEY:  I agree, Judge.  But in this case, I

18    think it's more a function of the systems that Wal-Mart used.

19    Because when you look at these checks, they're so -- I mean,

20    they're within seconds or minutes of each other.

21             THE COURT:  The one where you raise where you put

22    in the check and maybe it didn't go, so they tried it again

23    within five seconds -- that's kind of a reasonable, I think,

24    analysis of that one transaction.  I don't know how many --

25             Do you have many more of those?

1          MR. FRENSLEY:  Yes, Your Honor.

2      And, quite frankly, Your Honor, anticipating the

3  Government's argument, that's what I tried to do, was look at

4  only those attempts that were so close in time that that

5  would be a reasonable explanation.

6      If you look at -- for example, just go two more entries.

7  Go to 16 and 17 on Exhibit C.

8          THE COURT:  Okay.

9          MR. FRENSLEY:  And 16 is 1233:34.  17 is 1233:45.

10  11 seconds apart.  And, again, I think that's --

11      Granted, there may be some that are within a minute, a

12  minute-and-a-half, something like that.  But I think those

13  are reflective of the kind of examples that we've identified

14  at Page 3 of our position paper.

15      They're just so closely related in time that it wouldn't

16  even be a reasonable explanation to say, you know, I passed

17  the check, it doesn't go through, and then someone next to me

18  passes the exact same check with a different --  It just

19  doesn't.

20      And, again, it's a close call in terms of the amount,

21  Your Honor.  I think accepting those arguments under either

22  scenario, it puts Mr. McWhorter in the lower category.

23      And, quite frankly, again, I think Agent Stevenson, to

24  his credit, his testimony was that --

25      You know, this idea that Mr. Howard suggested, that this

 1    is just a floor and there's got to be more out there, that's

 2    not consistent with *Comer*, number one.

 3         And Agent Stevenson testified candidly, I think, that

 4    anything greater than these numbers would just be a guess.

 5    And I don't think a guess is enough to do it, Judge.  Even

 6    with the admissibility of hearsay, even with the lesser

 7    standard of proof, I just don't think they meet the burden.

 8         And for those reasons, Your Honor, we submit that the

 9    proper amount of loss should be reduced to the next lower

10    level.

11              THE COURT:  All right.  Let's move on to the next

12    objection, Mr. Frensley.

13              MR. FRENSLEY:  Yes, Your Honor.

14              THE COURT:  And that --

15              MR. FRENSLEY:  I think the next ones, Your Honor,

16    we can run through, hopefully, a lot quicker than that.

17              THE COURT:  Acceptance of responsibility.

18              MR. FRENSLEY:  Yes, Your Honor.  And I'll be brief

19    on this issue.  I'm not going to belabor the point.

20         I would submit that there is a well-established body of

21    law under 3E1.1 that acceptance is not automatically

22    precluded even though it wouldn't be applicable in a

23    situation.

24         I think if Your Honor will recall this case and the

25    whole manner in which it came about, this falls within the

exceptions that the guidelines talk about with respect to
acceptance of responsibility. The reason why this case went
to trial, number one, was related to the suppression issue
with respect to Counts 1 through 4.

Your Honor will recall we had a two-and-a-half,
three-day suppression hearing. Mr. McWhorter couldn't, as
the Government submits, just say I'm guilty and preserve that
issue without some type of agreement. So he went to court to
preserve that issue.

There is an abundance of case law that talks about the
adjustment being allowed where the trial is to challenge and
preserve a constitutional challenge with respect to the
admissibility of evidence or the applicability of statutes to
his conduct.

You'll recall likewise, Your Honor, at trial
Mr. McWhorter offered no serious proof to factual guilt with
respect to Counts 1 through 4 in this case. The only dispute
was as to Count 5.

And it was probably beating a dead horse on my part, the
way that I went at that. But it was very, very clear that
the issue was this William Blake ID that we suggested that
Mr. Vincent made, that my client had nothing to do with.

So setting aside Count 5. With respect to Counts 1
through 4, the only reason to go to trial was to preserve
that issue of the suppression issue.

1      And likewise, Your Honor, I think Mr. Howard makes an

2   allusion to it in his position paper.  That the interstate

3   nexus argument that I raised on the Rule 29 motion -- again,

4   I think under *United States vs. Fells* and many other cases

5   that talk about challenging the applicability of a statute to

6   particular conduct, I think this is more akin to what that

7   issue was.

8      I didn't really challenge the factual guilt.  Your Honor

9   saw the numerous statements that were played in evidence.

10      So we would submit that this is one of those cases that

11   is outside the heartland.  That with respect to Counts 1

12   through 4 that Mr. McWhorter, through his early statements to

13   law enforcement, should receive some benefit for acceptance

14   with respect to those counts.

15      And his decision to go to trial to preserve his

16   constitutional issue with respect to the suppression, to

17   challenge the applicability to the interstate nexus

18   provision, and to dispute Count 5 -- which Count 5, even if

19   he plead guilty to, he would receive no benefit for

20   acceptance of responsibility because it's a mandatory

21   sentence -- that those all support the application of the

22   adjustment in this case.

23         THE COURT:  Okay.  Let me hear from Mr. Howard.

24      You put your position in your position paper.  I think I

25   understand it.  But if you want to speak briefly about that.

I'll just say that Mr. McWhorter, my recollection is he contested each of the four counts.

I agree, Mr. Frensley, that there was an additional thrust with regard to Count 5 and identifying who actually was involved in that out-of-state driver's license. It was Kentucky, I believe. Was it Kentucky, where the guy --

Where was it?

MR. HOWARD: He was from Kentucky.

THE COURT: Yes.

MR. HOWARD: I believe it was a Tennessee license.

THE COURT: Anyway, there was a lot of attention paid to that. But I didn't think that Mr. Frensley let up on any of the top four, the other four counts either. He was active, as was Mr. McWhorter, on all of them.

So, in my view, he put the Government to the test on all four -- all five counts. There was particular emphasis on 5 because of its ramifications with the automatic statutory two-year sentence that is to be served consecutive to any other sentence.

So I more or less agree with your position paper. But if you want to point out anything else for the record, you are welcome to do it.

MR. HOWARD: No. I agree with everything the Court said.

I would just note that as far as the trial, there were

1    no stipulations to evidence, there was extensive cross

2    examination of Government witnesses, there was significant

3    argument on interstate commerce and others.

4        I don't think under any interpretation, this defendant

5    accepted responsibility.  He challenged, as is his right,

6    every piece of evidence, every argument, at every stage of

7    his proceeding.  To come now and seek acceptance of

8    responsibility is just simply not appropriate.

9        And the idea that one can take responsibility for giving

10   statements to law enforcement and then simultaneously be

11   attempting to undermine that and not preserve it is just

12   completely counterintuitive.

13       So we respectfully submit he did not accept

14   responsibility and should not receive a reduction.

15            THE COURT:  Thank you, Mr. Howard.

16       The next objection by Mr. Frensley is with regard to the

17   enhancement for the authentication feature, which is

18   recommended under the advisory guidelines.

19       There is an enhancement for sophisticated means, but

20   there is another enhancement for if the offense involved an

21   authentication feature or the production of authentication

22   features.  And, of course, there was an authentication

23   feature on the Tennessee driver's license and there was an

24   attempt to produce an authentication feature on the false

25   driver's licenses that were produced in this case.

1           MR. FRENSLEY:  Thank you, Your Honor.

2       With respect to this issue, as Your Honor noted, there

3   is already an adjustment for sophisticated means that I would

4   submit takes into account much of the same information that's

5   alleged to be the basis for the application of this

6   enhancement feature.

7       But with respect to this issue, Your Honor, there are

8   two arguments that we advance as to why this enhancement

9   should not apply.  The first is that the hologram is the

10  feature at issue in this case.  And in this case the hologram

11  that was issued was not a real authentication feature.  It's

12  a false authentication feature.

13      The guideline talks about referencing to 18, USC,

14  Section 1028 for the definitions of these terms.  And 1028

15  defines a false authentication feature as opposed to a real

16  authentication feature.  There are two separate definitions

17  for those.

18      And to the extent that Application Note 9 defines it as

19  it's defined in 1028, then our argument initially is that by

20  virtue of it being false, it doesn't fall within the terms of

21  the statute or the terms of the guideline for which it should

22  count.

23      The second argument that we advance with respect to this

24  issue is a double counting argument, Your Honor.

25      We have reviewed and looked at cases that the Government

1    has cited and set forth with respect to the efforts that we

2    made with the probation officer to try to resolve these

3    issues before this hearing.  And it appears, Your Honor, that

4    an important distinction between this case and all of those

5    other cases --

6        And, in fact, I'll submit that I haven't been able to

7    find any cases where the enhancement is applied where there

8    is an underlying conviction for production and possession of

9    the false identification.  It seems to me that that becomes

10   an important issue here.

11       Mr. McWhorter's convictions in Counts 1 through 4 have

12   as elements of those offenses an inclusion of the false

13   authentication features.  They include production and

14   possession of false identification documents.  And the false

15   authentication features were necessary to appear to be issued

16   by the state under the terms of the statute.

17       So, in other words, for Mr. McWhorter to be convicted of

18   those particular offenses, they would, under our submission,

19   necessarily require that the documents include authentication

20   features that make them appear to be issued by the state.

21       And so we submit that likewise, in support of this, with

22   respect to looking at the aggravated identity theft

23   guidelines at 2B1.6, Application Note 2, it likewise talks

24   about the double counting and not using the factors when the

25   means of identification is an element of the underlying

1    offense.

2        So in this particular situation, again, Your Honor,

3    there are the two arguments.  As I understand, the probation

4    officer's opinion is that he interprets the guideline, as I

5    believe the Government does, to include the attempt to make

6    it look real.

7        But, again, necessarily for him to be convicted of the

8    underlying offense, whereby he is required to make those

9    documents appear to be issued by the state, they would then

10   necessarily have to have those authentication features.

11   Otherwise, they wouldn't appear to be issued by the state.

12       You heard the testimony at trial, Your Honor, about the

13   various markings and the keys and the things that have to be

14   looked at for the document to appear to have been issued by

15   the state.  And the hologram was one of those issues, as were

16   tracking numbers, serial numbers, other items that were

17   identified by the various witnesses.

18       And so if those items had not been on the documents,

19   then they would not appear to have been issued by the state

20   because they wouldn't have looked like a legitimate,

21   authentic document.

22       So I believe that that's the distinction as to the

23   application of the guideline and the underlying offense.

24       And to the extent that Mr. McWhorter, unlike any of the

25   cases cited by the Government and unlike any of the cases

that I've been able to discover, included conviction for
production, possession of the identification documents, then
we would submit that to count those same factors as a basis
for enhancement under the guideline would be an impermissible
double counting.

And, as a result, Your Honor, we would respectfully
submit that the Court should decline to add the two-level
enhancement for authentication feature.

THE COURT:  Okay.  Mr. Howard.

MR. HOWARD:  First, Your Honor, I think it's worth
observing that we have addressed this particular enhancement
eight other times.  And in each case, the Court either
applied it or found that it factually applied but chose not
to apply it because of the *Plea Agreement*.

But that aside, even on the specific merits of the
defendant's argument, that argument fails and the enhancement
has to apply.

First, with respect to whether it's a fake hologram or
whether it's a real hologram.  As we point out in our
position paper, the harm that is sought to be addressed by
the guideline is whether there is this feature that makes it
more authentic, more dangerous, because it's more apt to
succeed.

Whether something meets the scientific definition of a
hologram is simply not relevant.  It's whether it served the

1    purpose of a hologram, which here it did.

2         We heard in the statements from the defendant at the

3    suppression hearing, in the recording, that it shimmered.

4    Well, that's precisely what a hologram is to do.

5         So I don't think the inquiry is about whether it's a

6    real -- technically, a real hologram or not.  In the same way

7    that I don't think a watermark would have to be, again, made

8    with a dandy rule on what paper pulp constitutes a watermark

9    under the guideline.  The harm addressed is the same.

10        Secondly, with respect to double counting.  Again, I

11   think it's a relatively simple concept that gets muddied in

12   the language of the guideline.

13        You get a certain enhancement for producing a false

14   identification document.  That gets you one level.  But then

15   if you add certain authentication features which makes it

16   really authentic looking, more authentic looking, more likely

17   to deceive, you get an enhancement.  That enhancement

18   reflects the enhanced dangerousness of the instrument.

19        Here, that's precisely what we have.  These driver's

20   licenses were particularly good, particularly apt to deceive

21   because they were really, really real looking because of

22   these all these authentication features.

23        Now, one of the suggestions was well, it can't be a

24   false identification document, it can't be a false driver's

25   license, unless it has an authentication feature; therefore,

1    it's double counting.  But I think that argument proves too

2    much.  Because, for example, this would still be a false

3    identification document if the microscopic print in the

4    flagpole that appears on the Tennessee driver's license, if

5    that didn't have the date of birth of a participant or the

6    driver's license number -- I forget what it is.

7        If it didn't have that, it would still be a false

8    identification document.  But by having that extra

9    authentication feature -- in my example, the text in the

10   flagpole -- that makes it more likely to deceive because it

11   is more authentic looking.

12       In the same way, it would still be a fake driver's

13   license.  It's still a false identification document, whether

14   it had this real hologram or a piece of foil that is 99% like

15   a hologram or something else.

16       So the enhancement -- there's no double counting with

17   respect to that.

18       Finally, the idea that because there's a production

19   count here that it's double counting.  I don't think that

20   applies either.  Again, it proves too much.

21       By definition, no defendant could ever produce a genuine

22   authentication feature because the only entity that can

23   produce a genuine one is the DMV or appropriate issuing

24   agency.  So by that reading, that would essentially fall out

25   of the statute because you could never have that by

1    definition.  I don't think that's a reasonable reading.

2       For all those reasons we submit that the Court should

3    find, as it has in all the other co-defendants' cases in this

4    matter, that the enhancement applies.

5        MR. FRENSLEY:  Your Honor, may I just briefly

6    address two points?

7        THE COURT:  Okay.

8        MR. FRENSLEY:  First, Your Honor, with respect to

9    what the Court has done with respect to co-defendants in this

10    case.  Again, I think it highlights the point that I made to

11    the Court with respect to the nature of the underlying

12    offense.

13       As I understand it, each of those defendants plead

14    guilty to conspiracy.  None of them plead guilty to the

15    substantive counts which Mr. McWhorter is being sentenced

16    upon, which distinguishes those -- which distinguishes all

17    the cases that I've explained to the Court my research has

18    discovered.

19       Secondly, Your Honor, I think that Mr. Howard's argument

20    that you couldn't ever actually have the authentic features,

21    it just simply -- it begs the question, Judge.  I mean, I

22    think that is the type of more egregious conduct that

23    Mr. Howard is saying that the guideline should reach.

24       If someone within the Motor Vehicle Department used the

25    legitimate actual documentation, used the legitimate

1    hologram, used the legitimate evidence and things that are

2    utilized in creating a real document, that would be the

3    greater risk, to follow his argument and the logic of that

4    argument.

5         So for the reasons we've set forth, we would argue that

6    this application shouldn't apply as an enhancement for

7    Mr. McWhorter's case.

8              THE COURT:  Is that all?

9              MR. FRENSLEY:  Yes, Your Honor.

10             THE COURT:  Okay.  This section under the

11   guidelines is found at 2B1.1, subparagraph (b)(10)(A).

12        The previous section, 2B1.1(b)(9)(C), adds two points if

13   the defendant was participating in this fraudulent scheme and

14   the offense otherwise involved sophisticated means.  And

15   there is an application note under that section at Footnote

16   8(B) in the Application Notes that defines *sophisticated*

17   *means* as especially complex or especially intricate offenses

18   involving conduct pertaining to the execution or concealment

19   of the offense.

20        And it lists, for example, a telemarketing scheme;

21   conduct such as hiding assets or transactions, or both,

22   through the use of fictitious names, entries, accounts, or

23   other kinds of sophisticated means.

24        In this case, of course, they used the Tennessee

25   Department of Corrections, the bank number of the Tennessee

1    Department of Corrections to route these checks; to create

2    the sophisticated checks, but also to route them, knowing

3    where they would be presented for payment and so forth.

4        There was also the fact of the materials involving this

5    plastic and this certain camera they used.  All those were

6    sophisticated means to produce these driver's licenses.

7        There's an additional two-point enhancement if the

8    offense involved an authentication feature or the production

9    of authentication features.

10       The authentication feature probably was the hologram

11   that is mentioned on the Tennessee driver's license, which

12   must appear.  And there are other documents that have

13   holograms and similar authentication features.

14       It generally means that those documents have a higher

15   level of security devices that are installed to make sure

16   that identity theft and security interests are not

17   duplicated.  And if you do duplicate those by involving

18   authentication features in your process of producing these

19   fraudulent documents, then that is a level of sophistication

20   that is above that that's covered that's in subsection

21   (b)(9)(C).

22       So if you're duplicating those features on those

23   important documents -- usually Government documents; not

24   always, but they're on passports and driver's licenses and

25   other security devices that are used for identification for

1     law enforcement purposes and other security purposes -- then

2     there is an enhancement.

3          And the Court believes that that section does apply in

4     this case because they produced -- Mr. McWhorter was the

5     expert in producing these authentication features and was

6     certainly personally involved in trying to duplicate the

7     Tennessee hologram on the driver's license in this case.  And

8     therefore, the Court believes that it applies.

9          I think the final one was the role in the offense,

10    Mr. Frensley, and whether or not Mr. McWhorter should receive

11    the recommended four-level increase because he was an

12    organizer or leader of this conspiracy which involved five or

13    more participants.

14         There's another catchall that says or was otherwise

15    extensive.

16               MR. FRENSLEY:  Correct.

17               THE COURT:  So you've got two hurdles to jump over.

18               MR. FRENSLEY:  I understand, Judge.

19               THE COURT:  And, you know, there were just hundreds

20    of checks distributed over the length of this conspiracy,

21    which was about --

22               MR. FRENSLEY:  I think about nine months.

23               THE COURT:  -- about eight months.  And it involved

24    nine people.

25               MR. FRENSLEY:  Thank you, Judge.

1          Your Honor, the basis of this argument, just simply put,

2     relates to the roles of Mr. Kennedy and Mr. Hampton.

3          It's our position, as set forth in the position papers,

4     notwithstanding the points that Your Honor has set forth,

5     that Mr. Kennedy, Mr. Hampton, and Mr. McWhorter all brought

6     something to the table.

7          Albeit slightly different, they were all integral, all

8     important, and all critical.  And to the extent that

9     Mr. Kennedy and Mr. Hampton didn't receive four points, it's

10    our position that Mr. McWhorter should not receive four

11    points, as well.

12         His role, we submit, was no greater or no less

13    significant or more significant than those individuals.  And

14    I think the trial testimony established that all shared

15    equally, for the most part, with respect to these matters.

16         Nothing would indicate that the four levels would apply,

17    but rather that the three-level reduction should -- or

18    increase should apply to Mr. McWhorter, as opposed to the

19    four.

20              MR. HOWARD:  I think the defendant's position on

21    this point is at odds with the entire history of this case,

22    the evidence at trial, his own admissions.

23         Mr. McWhorter is quantitatively different from

24    Mr. Kennedy or Mr. Hampton; much less all the other

25    co-conspirators, many of which were borderline incompetent.

1       Mr. Kennedy brought in some money.  Mr. Hampton was

2   essentially a laborer.

3       By all accounts of those co-defendants and the

4   defendant's own admissions to the police officers, he was the

5   driving force here.  He was the creative guru.  He was the

6   one with computer expertise.  He was the one that

7   manufactured everything.

8       And we see that not just from the direct evidence, but

9   also indirectly.  When the defendant stopped doing it, wasn't

10  creating things, the crimes ground to a halt; even when

11  Mr. Kennedy wanted to keep on doing it.  When Mr. Hampton was

12  arrested, the crimes didn't stop.

13      So there is abundant proof of the defendant's central

14  role in the conspiracy.  He's the creator, the intellectual

15  driving force for this.  He oversaw everyone else, every

16  other co-conspirator, including Mr. Hampton and Mr. Kennedy.

17      For all those reasons, as we stated in our position

18  paper, there's ample evidence to apply the four-level

19  enhancement.

20          THE COURT:  The Court believes that the proof in

21  the case clearly shows that Mr. McWhorter was the brains

22  behind this outfit.  Although he doesn't have any higher

23  education, he was known to have intelligence about computers,

24  as well as banking and the process of checks being routed.

25  And that without him, the conspiracy could not have been

1          carried out.

2                  He also was knowledgeable in the type of equipment that

3          had to be obtained in order to start this fraudulent

4          activity.  He had somebody to fund the operation, but they

5          funded it because of their confidence in his ability to carry

6          it off.

7                  He also recruited people.  And they were impressed with

8          his knowledge about how this could be successful.  And,

9          indeed, it was successful for a considerable amount of time.

10                 So the Court believes that the enhancement does apply.

11         He was both the organizer and the leader.

12                 As Mr. Howard said, later on, after they had met with

13         considerable success, they seemed to slack off for a while to

14         enjoy the benefits of their fraudulent activity, to spend

15         some money by entertaining themselves with drugs and other

16         things, but then they would bring it back up.  But they

17         needed Mr. McWhorter's involvement and direction and his

18         input in producing these fraudulent ID documents.

19                 So with that, we have a calculation of the offense

20         level.  And the Court's view is that with regard to the loss,

21         there is speculation and some proof to support that the

22         conspiracy was larger than what the facts that have been

23         presented to the Court show.

24                 I do think that Mr. Frensley has raised questions about

25         some of the documentation presented by the Government and its

1    accuracy and the calculations of both the actual loss and the

2    intended loss, that it's close to $200,000.

3        After the Government eliminated some checks and conceded

4    that they were either before or after the date of the

5    conspiracy or that there were possible duplicates, their

6    amount comes up to a little above $200,000. And

7    Mr. McWhorter's figures, through Mr. Frensley, come up just

8    under $200,000.

9        All parties agree that the records are not exact. The

10   Government has a burden of proving its loss. It must only be

11   reasonable. That's set forth in the guidelines, too, under

12   2B1.1. They don't have to prove with exactitude the amount

13   of loss. They can make a reasonable estimates of the loss,

14   but it can't be speculation.

15       They do base their estimate on records. The records,

16   however, seem to be subject to some interpretation. The

17   Government has agreed that the bottom line, that is the total

18   amount of the loss, is just something that no one exactly

19   knows.

20       And the agent, Mr. Stevenson, his response to one of

21   Mr. Frensley's questions was that Mr. Frensley's explanation

22   of duplication with regard to the intended loss with such

23   close time lines of the times within when the checks were

24   cashed at the same establishments, relating to Wal-Mart, that

25   Mr. Frensley's explanation of how that may have happened was

1    just as probable as what was proposed in his report and

2    suggested by Mr. Howard.

3        And on the basis of that uncertain proof, the Court

4    finds that the amount of loss is $200,000 or less.  I think

5    the breaking point is must be greater than $200,000.  And the

6    Court finds that it's less than $200,000 based on the

7    reasonable proof.

8        And that would reduce the base offense level -- not the

9    base offense level but the enhancement for the amount of the

10   loss to 10 rather than 12.

11       So the quick calculations are that the beginning or base

12   offense level under 2B1.1, subparagraph (a)(2), is six.  That

13   is that's the base offense level which corresponds with the

14   statute of conviction, which is Section 1028(a)(1) of

15   Title 18; also 1028(a)(3) of Title 18 and 1028(a)(5) of

16   Title 18.

17       The next enhancement suggested in the presentence report

18   is that the defendant receive a 12-level enhancement because

19   the loss was greater than $200,000, but less than $400,000.

20   And I've just commented about that.

21       There is evidence to suggest, because of the testimony

22   at trial, the bragging statements of Mr. McWhorter while he

23   was being interviewed by the police, and the sheer amount of

24   those checks and so forth that were found, that there was

25   more than that.  But there is also evidence that the reports

1    upon which those estimates are based have some duplication

2    and some explanation that brings it just under $200,000.  And

3    the Government's estimate is that it's just over that.

4         And the Court finds in favor of the defendant based on

5    the reasonable estimate, so there will be a 10-level

6    enhancement under 2B1.1(b)(1)(G).

7         Two additional points are added under subsection

8    2B1.1(b)(2)(A)(i) because there were more than 10 victims but

9    less than 50 victims.  That's not disputed.

10        An additional two points are added because sophisticated

11   means were used.  That's covered under 2B1.1, subsection

12   (b)(9)(C).

13        And we've just discussed and the Court has found that an

14   additional two points are added under 2B1.1(b)(10)(A)(ii).

15   That's also covered in the presentence report in

16   Paragraph 39.  The presentence report explains the

17   application of that additional two points regarding two

18   seals, security codes, holograms, and other similar items to

19   make them appear authentic.

20        Then finally, an additional four points are added

21   because the defendant was an organizer or leader of this

22   criminal conspiracy which involved more than five persons.

23   And the Court also finds that the conspiracy, along with the

24   activities that took place under the conspiracy were

25   otherwise extensive.  So that four-point enhancement would

1      apply.

2          So the addition of those figures determined by the Court

3      would add to 26 as the adjusted offense level.

4          There seems to be -- well, there is an objection, I

5      think, on the criminal history determination, too.

6          Mr. Frensley, the presentence report indicates that he's

7      in Criminal History Category VI.  You believe he should be in

8      Criminal History Category V, I believe.

9              MR. FRENSLEY:  That's correct.

10             THE COURT:  I'll hear you briefly on that.

11             MR. FRENSLEY:  Yes, Your Honor.

12         Your Honor, the first item is at Page 15 of the

13     presentence report.  Paragraph 49 relates to a conviction for

14     passing a bad check.  That's a conviction out of the state of

15     Missouri.  Liberty, Missouri is where it comes from.  And the

16     presentence report provides Mr. McWhorter with one criminal

17     history point for that conviction under 4A1.1(c).

18         In that regard, the sentence is counted and excluded,

19     Your Honor.  This check -- or this conviction rather, Your

20     Honor, I would submit is a sentence that should be excluded

21     under 4A1 -- I'm sorry, it's 4A1.2(c).  I think I said

22     1.1(c).

23         And there are two bases for counting certain sentences

24     under that particular provision with respect to misdemeanors.

25     The first is if the sentence was for a term of probation of

1        more than one year or a term of imprisonment of at least

2        30 days.

3            And in this case, Your Honor, as the presentence report

4        reflects, Mr. McWhorter was sentenced to one year of

5        probation in that case, not more than one year.  So under

6        4A1.2(c)(1)(A) the sentence would not count, being one not in

7        excess of a year of probation.

8            Then, Your Honor, look to Section (b).  That talks about

9        the prior offense was similar to the instant offense.  And,

10       of course, the instant offense in this case, as Your Honor is

11       well aware, deals with production of these false

12       identification documents and fraudulent checks and things of

13       that nature that are counterfeit in nature.  Mr. McWhorter

14       was charged --

15           And we've had some discussions between myself, the

16       United States Attorney --

17                   THE COURT:  Which paragraph is that, Mr. Frensley?

18                   MR. FRENSLEY:  Paragraph 49 of the presentence

19       report, at Page 15.

20                   THE COURT:  Okay.  You're still on that first one?

21                   MR. FRENSLEY:  Yes, Your Honor.

22                   THE COURT:  Okay.

23                   MR. FRENSLEY:  That's the one that I'm on.

24                   THE COURT:  Okay.

25                   MR. FRENSLEY:  There have been some discussions.

The probation officer provided some additional documentation from Missouri with respect to that particular offense, which doesn't really illuminate it any further.

As a result, Your Honor, I went and looked at the statute, the Missouri statute for passing a bad check. And I would respectfully submit that my interpretation of that --

It's Revised Statute Missouri, Section 520 -- I'm sorry, 570.120. It's the offense of passing a bad check.

I would submit that that is the insufficient funds statute in the state of Missouri. And that, Your Honor, is consistent with my understanding of what this particular offense involved.

There's no allegations in this *Affidavit of Complaint* that the probation officer provided that indicates that the offense that Mr. McWhorter was charged with back in 1999 and plead guilty to in 2000 as a misdemeanor was for anything other than an insufficient funds check. The statute speaks to it being of insufficient funds.

The probation officer indicated that the inclusion of the language "with the purpose to defraud" or the mens rea in the *Affidavit of Complaint* might somehow make it something else. But certainly Missouri, like any other statute -- or any other state would have forgery statutes, would have identity theft type statutes, statutes of that nature that would take into account conduct other than insufficient

1    funds.

2         And the inclusion of a mens rea in an insufficient funds

3    charge would just be a natural course of events.  I think

4    Tennessee's statute for insufficient funds includes a mens

5    rea element.

6         So there's no evidence to suggest that there is anything

7    about this case in 1999 that was anything other than an

8    insufficient funds check case.  And so to the extent that it

9    is of the nature of the enumerated offense of insufficient

10   funds, it was a sentence of probation for not more than one

11   year.

12        And it was not similar to the instant offense, which

13   involved the creation of this sophisticated conspiracy that

14   Your Honor heard the trial on.  And this is an offense that

15   should not be counted.  And that one point under Paragraph 49

16   of the presentence report should be retracted.

17        And to that extent, Mr. McWhorter's criminal history

18   category -- or criminal history points should be reduced by

19   one point, taking away this bad check statute that was just a

20   simple misdemeanor insufficient funds check and is not

21   countable under the offense.  And there is no evidence to the

22   contrary that it was anything but that.

23             THE COURT:  Okay.  Now, was there one other

24   objection to another point?

25             MR. FRENSLEY:  Yes, there was, Your Honor.  If

1        you'll let me go ahead and take that up now, I will.

2              That was, Your Honor -- I think I left my copy at the

3        counsel table.

4              The objection was to the one point added for recency.

5        That's at --

6                    THE COURT:  Because the offense was committed less

7        than two years from being released from jail.

8                    MR. FRENSLEY:  Yes.  That's it.  I believe that's

9        Page 20.  22, maybe.  I'm not sure.

10             I apologize, Your Honor.  That is the issue though, Your

11       Honor.  It's the recency point.  The one point that's added

12       for that particular reason.

13             I suppose this is really, technically, an argument for a

14       variance, Your Honor.  Because, again, speaking with the

15       probation officer, the situation is this:

16             As the Court is probably aware, the United States

17       Sentencing Commission has promulgated new guidelines to go

18       into effect in November, absent some Congressional action.

19       And in this particular situation with respect to the recency

20       point, the Court has -- or sorry, the Commission has proposed

21       two options regarding the calculation of those recency

22       points.

23             The first option would eliminate the recency points for

24       all offenders in all cases.  The second option would be to

25       eliminate the one additional point currently applied in cases

where the defendant also receives the two points for having been under a sentence of incarceration.

And it's Mr. McWhorter's position, Your Honor, that under either of those positions announced by the Commission, that it would be improper for the Court to apply the recency point in this particular case.

The Commission has held hearings.  They have received public comment and testimony.  They have gone through the entire process that they go through to make policy statements with respect to the guidelines, stating that it's their belief that this additional point under either of those options should not apply to people such as Mr. McWhorter.

And while I respectfully understand probation's position with respect to this, Mr. Hersh stating that until -- until it's in the book in November, then we don't count it.  And I understand that, Your Honor.

But I think that this is an argument for a variance in this case, in light of the findings and determinations of the Sentencing Commission.

As I've noted, they have had extensive hearings, extensive investigation into this matter.  They have concluded that recency points add nothing to the predicted quality of criminal history scores.  And also, Your Honor, that the points fail to reliably reflect meaningful differences in past criminal behavior.

1     They essentially have argued or set forth as the policy

2     of the Commission that these points or this point for recency

3     should not apply.

4     And it's my argument that while it is true for purposes

5     of determining the guidelines that the Court may, as

6     Mr. Hersh suggests, need to make a finding that as of right

7     now the point applies for purposes of calculating the

8     criminal history, that consistent with the findings of the

9     Sentencing Commission and its actions that the Court should

10    grant a variance to reduce Mr. McWhorter's criminal history

11    category by that one additional point.

12    And I would merely adopt and incorporate the Sentencing

13    Commission's findings and reports with respect to its policy

14    statements on this issue and submit that in light of that

15    well-established authority from the Commission, that it would

16    be appropriate for the Court to grant a variance with respect

17    to that one point.

18    Now, the significance of these arguments in tandem here,

19    Your Honor, is that if the Court concludes, as we suggest,

20    that Mr. McWhorter should not receive the one point for the

21    bad check case out of Missouri from 1999 on the basis that

22    there's no evidence to suggest that this is anything other

23    than an insufficient funds check and, therefore, should be

24    excluded under the guidelines, and if the Court grants the

25    variance as requested with respect to the recency point in

1    light of the Commission's recommendations and policy

2    findings, that it would result in a two-level -- or a

3    two-point decrease to Mr. McWhorter's criminal history score

4    and, therefore, take him from a Category VI to a Category V.

5        And that would be the argument that we would advance.

6    And we would respectfully request that the Court grant our

7    arguments with respect to the one point for Paragraph 49 and

8    the one point for the recency issue, in light of the

9    Commission's action.

10        THE COURT:  Okay.  Let me hear from Mr. Howard on

11    those two points, briefly.

12        MR. HOWARD:  I'll turn first to the question about

13    the Missouri conviction.

14        There are a couple of conditions, both of which need to

15    be met for that point to drop out, as the defendant suggests

16    it should.

17        First, it has to be one of the enumerated offenses in

18    4A1.2(c).  Specifically here, an insufficient funds check

19    charge.

20        Mr. Frensley suggests that that's what this is.  And I

21    agree with him that based on the charging document from

22    Missouri and the other material that the probation officer

23    has assembled, it is not crystal clear.  And that statute

24    does include a situation where someone writes a check on

25    their valid account, knowing that there's not sufficient

1    funds and it bounces.

2        That statute, however, also includes a subsection (1),

3    which deals with what we traditionally think of as a bad

4    check.  One that is not on a valid account, but that is a

5    fraudulent check; or one that was passed -- one that was

6    passed knowing that it was not valid.  So I think it's

7    equally labeled for both.

8        Plus, in reviewing the *Affidavit of Complaint* in that

9    case, it states in the Missouri case that this involved a

10   check drawn on Farley State Bank, Parkerville, Missouri,

11   dated November 21st, 1998, payable to K C Autoplex.  Which

12   suggests to me in the language of the charging document that

13   this was not a personal check there simply was insufficient

14   funds in.  Rather, it was a payroll check or some other kind

15   of business check.  Which I would submit makes it more likely

16   that this doesn't even -- we don't even get to the situation

17   brought by 4A1.2(c).

18       However, even if the Court assumes or agrees with the

19   defense that it does fall into that category, it still does

20   not drop out.  Because one of the conditions that needs to be

21   met is that it does not involve a prior offense similar to

22   the instant offense.  So if it is similar to the instant

23   offense, then it counts.

24       It's hard to imagine something more similar to this

25   case, which involved the passing of counterfeit bad checks

1 again and again and again, day after day for eight months,

2 than a charge involving a bad check passed to get money.

3   This whole case -- while, yes, it was dressed up with

4 identification documents and the computer and the computer

5 technique and the authentication features and all the rest,

6 at bottom, all of that was a means to make the passing of a

7 bad check more effective and more likely to get the money.

8 That's exactly what this charge in the state of Missouri is

9 about.

10   For that reason primarily I would argue that even if you

11 assume that 4A1.2 is in play, I would argue that the prior

12 offense is similar to this offense given that it involved a

13 bad check.  And therefore, the probation office correctly

14 added the one point.

15   Very briefly on the second issue with respect to the

16 proposed guidelines.

17   As the probation office noted, the guidelines are what

18 the guidelines are today.  Today, there's really no argument

19 that the point was properly assessed.

20   I would also note that this crime occurred in

21 November -- ended, at least, in November of 2006.  It began

22 in January, February, March of 2006.  So we've had several

23 iterations of the guidelines since then, all of which

24 included this point.

25   That the Commission or that Congress may -- may approve

1    the proposed change is really of no moment in this

2    proceeding.

3        Moreover, I think that the equitable arguments or

4    variance arguments that were advanced also missed the mark.

5    The Commission --

6        The wise and studied Commission that Mr. Frensley

7    referred to may well have come up with a number of other

8    changes that would increase the likelihood of sentencing

9    exposure.  And I'm confident that those wouldn't be argued

10   with equal vigor.

11       So I think before the Court there's really no

12   disagreement with what the guidelines hold with respect to

13   this issue.  And the Court should apply that point, as well

14   as the points that relate to the Missouri conviction.

15       For those reasons, we would ask that the probation

16   officer's view be upheld by the Court.

17            THE COURT:  Thank you, Mr. Howard.

18       With regard to the criminal history points, specifically

19   as relates to the defendant's objections, the first had to do

20   with the Missouri conviction under Paragraph 49, which is

21   titled in the report passing a bad check in Missouri,

22   sentenced to one year of probation.  He plead guilty to that.

23       I think Mr. Howard is correct, although I think

24   Mr. Frensley has done a good job in suggesting that that was

25   merely a misdemeanor.  The sentence was not more than one

1    year, which is the amount required in 4A1.2(c)(1) for the

2    application of the point.

3        But that provision also says or the prior offense was

4    similar to an instant offense.  And, of course, it is passing

5    bad checks.  And that is the gravamen of what this conspiracy

6    was all about, was passing bad checks.  So the Court believes

7    that under that provision it should apply.

8        Secondly, with regard to whether one point should be

9    added because the offense was committed less than two years

10   from the defendant's release from prison.  That's part of the

11   guidelines now.

12       Mr. Frensley purports that it's suggested by the United

13   States Sentencing Commission that it be changed.  It's open

14   for comment.  It may, indeed, be changed, but there's no way

15   I can predict that.  Congress has to approve it, as well.

16   And so it may be projected as a change, but it's not

17   imminent.

18       And there is some history of the case, in that it was

19   committed in '05 and '06.  Actually, the conspiracy was in

20   '06, from March to November of '06.

21       All the other defendants have been sentenced.  All of

22   them, to the extent that this offense was less than two years

23   from them being released from jail, they were also subject to

24   that additur to their criminal history point total.

25       Furthermore, having ruled on the objection of the

1    Missouri case -- that is, that that one point applies -- that
2    would give the defendant 13 criminal history points, which
3    would put him in Criminal History Category VI.

4        So the one point that we're addressing now, about
5    whether it applies or is not applied because it's been
6    suggested for change, for elimination, would not change his
7    criminal history category from VI.  Because with that point
8    added, he has a criminal history of 14.  So subtracting one
9    point would still leave him in the same criminal history
10   category.

11       I've ruled, I think, on all the objections.  I'm going
12   to let the lawyers consider that.  We'll come back.  I know
13   there's argument by the defendant about the variance.

14       Both lawyers want to argue about what the proper
15   sentence should be, what is the sentence that's sufficient
16   but not greater than necessary in this case.  I also want to
17   hear from Mr. McWhorter.

18       I won't have time to do that before 1:00.  I've got a
19   meeting outside of the office for lunch, and I'm going to
20   adjourn now.  We'll come back at 2:00 and finish the
21   sentencing procedure.

22       We'll stand in recess.

23                            (Recess was taken at 12:40 p.m.)

24

25            THE COURT:  Be seated.

1     When we recessed for lunch, we had made it through all

2     the defendant's objections except for restitution.  The

3     *Presentence Investigative Report* lists the restitution as

4     $128,383.55.

5     We've talked about the actual losses earlier.  It

6     appears that there was only one victim that responded to the

7     presentence report writer's inquiry about the amount of their

8     loss.  So if that is true, I assume we're talking about

9     Wal-Mart and any others that they have specific knowledge

10    about.

11    What's the Government's position on restitution?

12    MR. HOWARD:  Our position on restitution is that

13    whatever actual loss figure the Court has determined -- I

14    know we've gone back and forth somewhat -- that that figure

15    is the same as restitution in this case.

16    Obviously, intended loss, whatever the amount of that

17    the Court found, that's not part of it.  But the figures

18    listed on Exhibit A, or Exhibit 1, represent actual loss for

19    those stores, including Wal-Mart.  And we would ask that that

20    be the restitution.

21    THE COURT:  All right.  Stay with me a moment.

22    On that first exhibit, Exhibit A, there was a total loss

23    figured at $96,143.40.  That was initially.  And then the

24    Government has deleted some of these checks that were outside

25    the date of conspiracy or otherwise they found were not

1    appropriate.  The highlighted rows on Exhibit A.  They

2    eliminated those, which amounted to $10,323.46, for a total

3    of $85,819.94.

4         The defendant says, I believe, that that deductible

5    amount is $12,047.02, rather than the $10,323.  That,

6    obviously, would result in a different concluding figure.

7         Is that more or less where we are, do you think?

8              MR. HOWARD:  That's right.  And we're a little bit

9    further --

10        The Government is not contesting the arithmetic issue

11   before.  So I think that the number for actual loss for

12   Wal-Mart, as I have it, is $84,096.38.  $84,096.38.

13             THE COURT:  Okay.  Thank you.

14        That's simply subtracting the $12,047.02 from the

15   original figure, I believe.

16             MR. HOWARD:  Correct.

17             THE COURT:  Okay.  Let's hear from Mr. Frensley.

18   He's got a frown on his face.

19             MR. FRENSLEY:  Sorry.  All right.  It's more math,

20   Judge.

21             THE COURT:  You've been doing pretty well for a guy

22   that didn't do much in math.

23             MR. FRENSLEY:  I do my best, Judge.

24             THE COURT:  I think we ought to make your figures

25   more suspicious.

1          MR. FRENSLEY:  Your Honor, I believe that the

2     actual loss I think Your Honor has indicated with respect to

3     the Wal-Mart issue that we have suggested is that $84,000

4     range.

5          The only other thing I guess I would point out -- and I

6     don't know.  Again, there's just not enough evidence, really,

7     to make this determination.  But do you recall with respect

8     to Agent Stevenson, there was this conversation about the

9     State of Tennessee.  And it's my belief that perhaps those

10    checks were payroll checks cashed at Wal-Mart, and they're

11    reflected in the Wal-Mart amount.

12         So that would be the only other issue, I guess, I would

13    take, would be with the $7,168.68 in Exhibit A that's

14    indicated for the State of Tennessee.

15         To the extent that Stewart's Pharmacy is the only one

16    who provided any information back with respect to actual

17    loss, I guess I don't really know whether these amounts were

18    paid -- were recovered through some sort of insurance or

19    anything like that.

20         There's also one other issue.  That is I can't recall --

21    it's not reflected in Mr. McWhorter's presentence report what

22    sort of treatment the Court gave restitution with respect to

23    the co-defendants, who all plead guilty to the conspiracy.

24         Perhaps Mr. Howard has a recollection.  I was here for a

25    couple of those sentences.  I felt like my recollection was

1    that it was somewhere in the $70,000 range of restitution for

2    those folks.

3            MR. HOWARD:  I can address that.

4        It's somewhat convoluted, but there were certain

5    defendants for whom they were held responsible for the

6    entirety of the conspiracy because they cashed one or two or

7    three checks.

8        I think my predecessor's view, in conjunction with the

9    probation office, was to try to make that equitable in terms

10   of restitution.  So even though those persons had a limited

11   role, they would under the law have been liable for the

12   entire amount of the conspiracy; which at that time it was

13   determined for those defendants to be over $300,000.

14       We did a pro rata amount of $70,000 for certain

15   defendants.  That was not true, however, for all the

16   co-defendants.  At least Mr. Kennedy, and I believe --

17       At least Mr. Kennedy, and maybe Mr. Vincent -- I'm not

18   sure.  I know Mr. Kennedy, because he was involved during the

19   entire time of the conspiracy.  He was responsible for the

20   entire amount of the restitution.

21       So our position would be there's no basis for this

22   defendant to get a pro rata amount.  He was obviously there

23   at the very beginning, he was there at the very end.  Like

24   Mr. Kennedy, for example, who was the other defendant who was

25   in from the beginning to the end.

1          MR. FRENSLEY:  At a minimum, Your Honor, I would

2     submit that the Wal-Mart loss should be reflected in the

3     change in mathematical calculations and the additional

4     $1,800, which is around $82,000 on Wal-Mart.

5          MR. HOWARD:  I guess I should add, Your Honor,

6     we're not disputing that whatever the amount is, it's joint

7     and several with the other defendants and their amounts.

8          THE COURT:  All right.  For the amount of

9     restitution, the Court will set the amount of $82,296.11.

10        That figure represents the $96,143.40 listed on

11    Exhibit A as the amount of the loss by -- actual loss by

12    Wal-Mart.  It inserts the defendant's objections to some of

13    those checks, as well as the Government's acknowledgment that

14    some of those checks should be eliminated, the total of which

15    was $12,047.02.  That reduces the actual loss to $84,096.38.

16        Mr. Frensley pointed out some other over-representations

17    by Wal-Mart in the calculations of the actual loss in the

18    amount of $1,800.27.  So I've subtracted that from the

19    $84,096.38, for a total of $82,296.11.  And that restitution

20    will be entered joint and severally.

21         MR. HOWARD:  Your Honor, the number you just

22    announced, does that refer to Wal-Mart alone or to the other

23    victims that appear?

24         THE COURT:  There were no other victims considered,

25    unless you can point some out.

The presentence report indicated there were no other
victims that answered the questionnaire about losses.

MR. HOWARD: Well, I don't dispute that some of
these other victims may not have contacted the pretrial --
I'm sorry, the probation officer formally. I don't think
that's the test, however, under the mandatory restitution
requirements under Section 3664.

We presented evidence in the form of testimony that the
losses for these other stores were specifically tied to
checks that had been actually recovered.

THE COURT: Is that the stores on Exhibit A --

MR. HOWARD: Correct.

THE COURT: -- listed after Wal-Mart?

MR. HOWARD: Yes.

THE COURT: Have you added up those?

MR. HOWARD: Well, I did add them up when I
originally had the $85,000 number. I haven't done it on the
fly, with the Court's new revised figure.

THE COURT: Well, first, let me say, you're saying
that these other stores listed in Exhibit A under Wal-Mart,
beginning with Smithville Foods through Sam Ash Music on that
page, that's an indication that they lost the amounts
indicated across from their names?

MR. HOWARD: Right. That's the Government's
position.

1          THE COURT:  And you're saying further that those

2     figures are not included in Wal-Mart's $84,096.

3          MR. HOWARD:  Correct.  Wal-Mart is just one of

4     several.

5          THE COURT:  Okay.  I think you're correct.

6        Do you have any retort to that, Mr. Frensley?

7          MR. FRENSLEY:  I liked Your Honor's first position

8     there, that nobody else made any other indication.

9          THE COURT:  Well, they may not.  But the

10    investigator says that they relied upon statements made by

11    the local officials, as well as the stores in which these

12    transactions took place.  And they used that information and

13    maybe other information, but they used that information to

14    compile this list.

15       And they are very specific in terms of not only the name

16    of the stores, that is the victims, their addresses, their

17    phone numbers, and the contact person that related this

18    information to them.

19          MR. FRENSLEY:  But what we don't know, though,

20    Judge --

21       I think my argument is that we don't know whether this

22    represents actual loss to them or if they've otherwise

23    recovered those funds, in the absence of them having any

24    contact with probation in response.

25       If they otherwise recovered the funds and then were

1   ordered restitution on top, it would be a windfall to them.

2          MR. HOWARD:  But the restitution statute provides

3   for that exact situation.

4          THE COURT:  It just says reported loss on the

5   column.

6      Do we need to call the investigator back and clarify

7   that?

8          MR. HOWARD:  I don't know that anything needs to

9   be --

10     I'll be happy to clarify something, if the Court is

11  asking me to do that.  I'm not sure what the question is.

12         THE COURT:  Well, the question is Mr. Frensley said

13  he wasn't sure whether that represented actual loss or

14  whether it was an amount where the check had been cashed but

15  somehow they had collected funds otherwise.

16         MR. HOWARD:  If they had collected funds from some

17  other source?

18         THE COURT:  From some other source and it was not

19  an actual loss.

20     In other words, whether it was just checks cashed or

21  attempted to be cashed, but they didn't suffer these losses

22  in the amounts stated.

23         MR. HOWARD:  Could I have just a moment, Your

24  Honor?

25         THE COURT:  You can ask him.  And if he wants to

1    answer that question, we can bring him back.

2                    (Discussion held off the record.)

3            MR. HOWARD:  I mean, like I say, it's a two-part

4    answer.

5        I can safely state that we don't have -- the agent

6    doesn't have any information regarding the individual

7    insurance arrangements or whether these stores may have filed

8    some civil small collections claim or those type of things.

9        So I don't think that we have any evidence to add to

10   that point, but I don't think the restitution statute

11   requires us to do that upfront.

12       Everyone agrees that no victim should get a windfall.

13   There should be no double collection.  So, for example, if

14   Smithville Food Mart had an insurance carrier that paid out

15   $423 on one of these bad checks, no one is suggesting that

16   Smithville Foods gets a double recovery.

17       By operation of the restitution statute, though, that

18   can be factored in when the probation office actually does

19   the collection, whenever that happens.  There's a provision

20   specifically in there that all it would do is it doesn't

21   change the restitution amount, it just shifts to whom the

22   restitution is owed.

23       So that $423 would then not go to Smithville Food.  It

24   would go to ABC insurance carrier.  This happens quite often

25   in this type of case.

1    In the same sense as if there were a compensatory

2    damages claim in a civil suit.  That doesn't change the

3    Court's obligation under 3664, my reading of it, to set what

4    the total restitution is.  The actual calculation is

5    reflected where that restitution is actually paid, but it

6    doesn't affect the Court's obligation to set restitution.

7         THE COURT:  All right.

8    Mr. Stevenson, would you come back up here a minute and

9    answer a question for me.  If you've got that Exhibit A,

10   which is the loss amount --

11        AGENT STEVENSON:  Yes, sir.

12        THE COURT:  Consider yourself still being under

13   oath to tell truth.

14        AGENT STEVENSON:  Yes, sir.

15        THE COURT:  Do you have that list in front of you

16   that begins on the far left side with the victim?

17        AGENT STEVENSON:  Yes, sir.

18        THE COURT:  The first victim is listed as Wal-Mart.

19   Then there's a series of establishments -- pharmacies,

20   markets, gas, so forth -- under that.

21   How did you arrive at the figures for the reported loss

22   for all of those others under Wal-Mart?

23        AGENT STEVENSON:  Other than Wal-Mart?

24        THE COURT:  Yes.

25        AGENT STEVENSON:  These figures were reported

1    directly from either the police reports or the individual

2    stores.

3        For example, the first one, Smithville Foods.  When the

4    check or multiple checks would come in, they came in to be

5    cashed, this particular store paid that amount of money out.

6        Now, whether they received anything in return from the

7    bank or insurance or otherwise, I couldn't tell you.

8            THE COURT:  But they paid this amount on a bogus

9    check?

10            AGENT STEVENSON:  Yes, sir.

11            THE COURT:  Okay.  Do you want to ask him anything,

12   Mr. Frensley?

13            MR. FRENSLEY:  No, Judge.

14            THE COURT:  Do you want to ask him anything?

15            MR. HOWARD:  No.

16            THE COURT:  Okay.  Thank you.

17       Okay.  I'm going to add those amounts to the amount of

18   restitution.  It seems clear from the officer's clarification

19   that these were additional losses as a result of this

20   identity theft and fraudulent check conspiracy.

21       I don't have a computer with me, but I'm going to add

22   all those numbers.  I may have that done while we complete

23   this ceremony.

24       So with that, Mr. Frensley, let's move to the part in

25   your *Sentencing Memorandum* where you talk about a variance in

order to --

Well, there's two things.  One is you say that there
should be a variance for his cooperation with the state
authorities.

THE COURT:  That's correct.

THE COURT:  And you mention some other things, too.
But I think just to clarify where we are, we have a guideline
range now, as adjusted by the Court down two levels, with an
adjusted offense level of 26, Criminal History Category VI,
with a recommended guideline range of 120 to --

Just a minute.

(Discussion held off the record.)

THE COURT:  We have to select a sentence that's
sufficient but not greater than necessary to meet all the
sentencing factors in 3553(a).

MR. FRENSLEY:  Thank you, Your Honor.  As Your
Honor pointed out in the *Sentencing Memorandum* --

Your Honor, I'm not sure what -- in the world of ECF, I
don't know if I need to make any sort of preliminary remarks
with respect to the record on this matter.

Obviously, Your Honor has reviewed the memorandum I
submitted.  And there are some matters I'm going to touch
upon.  I guess I'll leave that to the Court's discretion.
I'm not sure if I need to make any statement on the record
with respect to sealing this portion or anything of that

nature.

THE COURT:  You have attached to your *Sentencing Memorandum* a letter from a District Attorney --

MR. FRENSLEY:  That's correct, Your Honor.

THE COURT:  -- who relates some assistance that he received from Mr. McWhorter relating to another offense.  And it's set forth there in that one-page letter.

The Government has also mentioned that.  They have somewhat of a contrary view, perhaps.  But you're relying on that, among other things --

MR. FRENSLEY:  That's right, Your Honor.

THE COURT:  -- to justify a variance in the recommended, but advisory only, guideline range for sentencing.

MR. FRENSLEY:  That's correct, Your Honor.

Your Honor, with respect to this issue, the Court may recall that back a couple of years ago there was a murder over in East Nashville of a Vanderbilt professor and his sister who was visiting from out of the country.  And subsequent to or shortly after that murder, some individuals were apprehended using credit cards and other identifying information from that particular professor.

That professor was someone who was, I believe, only one of maybe eight people in the world who could identify and read certain Aztec Indian language.  He was someone who made

1       a very significant academic impact.

2           One of the individuals who was charged with those double

3       murders was an individual named George Cody.  And Mr. Cody is

4       a member of the Vice Lords gang.

5           Mr. Cody was housed in the Criminal Justice Center.  And

6       during the time of his incarceration, Mr. McWhorter, as the

7       Court has observed through the testimony of others, has a

8       degree of intellect with respect to matters of criminal law

9       and whatnot that just results in folks seeking him out for

10      advice.

11          Mr. McWhorter was approached by Mr. Cody, wanting to

12      know certain information about the charges he was facing,

13      because Mr. Cody came to learn that Mr. McWhorter was charged

14      with financial crimes.

15          And during the course of those conversations, Mr. Cody

16      told Mr. McWhorter certain information about the charges he

17      was facing in the murder investigation and made certain

18      statements with respect to his involvement in that; admitting

19      that he was there at the time that the two individuals were

20      murdered, but stating that he did not pull the trigger, if

21      you will.

22          He also told Mr. McWhorter certain matters that were

23      outside the realm of the public domain.  Things that related

24      to the offense, but were not publicly reported, were not

25      otherwise known to the public at large.  So therefore --

1    Initially, Mr. McWhorter didn't think much of it.

2  People talk a lot, and he didn't really know whether there

3  was truth to the matter.  He was subsequently able, through

4  conversation with other individuals, to corroborate some of

5  the information that Mr. Cody had told him about.

6    And thereafter, he wrote a letter on his own -- in fact,

7  without my knowledge -- to the Metropolitan Police

8  Department, indicating his knowledge about some matters

9  related to that murder investigation.  And he put in that

10  letter some information that was not publicly known.  Stating

11  if this is true, you know, and you want to talk to me, I'm

12  willing to talk.

13    Thereafter, I was contacted.  Mr. McWhorter gave a

14  proffer to Assistant District Attorney General Robert McGuire

15  and another Assistant District Attorney who was involved in

16  that murder case.

17    Mr. McWhorter, as set forth in the *Sentencing*

18  *Memorandum*, provided the state with significant information.

19  Most importantly, information regarding admissions made by

20  Mr. Cody that placed him at the scene of the crime.

21    He also provided information that in the first instance

22  was unknown to the Metropolitan Police Department.  He

23  provided information about a hiding place that was utilized

24  to store one of the murder weapons.

25    The Metropolitan Police Department indicated that prior

to Mr. McWhorter's statements to them, they didn't even know anything about this, but that they subsequently corroborated the existence of this hiding place.

He likewise provided information that, again, the state was able to corroborate as having been never disseminated publicly and otherwise would not have been known to Mr. McWhorter, but for the statements of Mr. Cody.

Now, all of these things were significant, as Mr. McGuire sets forth in his letter. He states, In a case that was largely circumstantial, I believe that Mr. McWhorter's testimony positively impacted the jury and helped them reach the verdict that they ultimately came to.

The Court is well aware of the power of an admission in a case. But in this particular case I would submit it was even more powerful because Mr. Cody asserted a defense that he was involved with credit cards, he was involved with using the information that was taken from the home of the professor, but that he wasn't there and didn't participate in it.

So, essentially, he had a defense to the more serious offense of felony murder. His argument was basically that I otherwise obtained these credit cards and then used them, but I didn't have anything to do with the murder, nor was I even there.

So, again, that highlights, I would submit, the

1    significance of Mr. McWhorter's testimony.  Because it not

2    only provided the admission by Mr. Cody, but also gave

3    corroborating information that the police were able, through

4    subsequent testimony in that murder trial, to say, yes, all

5    these facts that Mr. McWhorter testified to were not in the

6    public domain, were not known to any individuals outside of

7    the case, and the only way that Mr. McWhorter could have

8    known them is for Mr. Cody to have told him.

9        So not only is the admission testimony itself

10   significant, but, more importantly, the manner in which the

11   state was able to independently corroborate Mr. McWhorter's

12   testimony essentially defeated Mr. Cody's defense in that

13   case and provided the linchpin for the convictions for the

14   murders in that case.

15       And, as I said, these were cases that weren't by any

16   means a slam dunk for the state.  And as indicated by

17   Mr. McGuire in his letter, the cases were largely

18   circumstantial.

19       So this admission testimony, coupled with the matters

20   that gave additional credibility to that testimony, made

21   Mr. McWhorter's testimony extremely significant and useful in

22   that proceeding.

23       Now, I understand in this case, Your Honor, that the

24   Government has not filed a motion under 5K1.1 regarding

25   substantial assistance.  But I nonetheless submit that the

factors set forth in that guideline provision are essential
and are instructive to the Court with respect to evaluating
the cooperation that Mr. McWhorter gave in this double murder
case.

I've spoken to the first one regarding the significance
and usefulness of the defendant's consideration.  And then
likewise, Your Honor, with respect to the second factor
addressing the truthfulness, completeness, and reliability.

That was established by the state being able to put an
officer on the stand who could testify to corroborate the
testimony that Mr. McWhorter gave, thereby establishing its
truthfulness, completeness and reliability.

Likewise, Your Honor, with respect to the third element,
the nature and extent of that assistance.  Mr. McWhorter made
the ultimate extent of his cooperation by testifying against
Mr. Cody in that trial.  Which I'll address, to an extent,
with respect to the fourth factor, which is injury suffered
or danger or risk of injury.

And in this particular case, again, as General McGuire
points out in his letter, Mr. Cody is a member of the Vice
Lords gang.  The Vice Lords gang is a street gang.  They're a
violent gang.  They're a gang that is predominant in the
prisons here.

And Mr. McWhorter, in addition to taking on the risk of
testifying against a known gang member that's inherent in

1   such action --

2       As Your Honor may imagine, because of the victims in

3   that particular murder case, this was a trial that garnered a

4   significant amount of attention.  And Mr. McWhorter was front

5   and center because, again, of the significance of his

6   testimony.

7       It resulted in him being identified by name in news

8   media outlets.  Specifically, on television.  A close-up

9   picture of him on the witness stand was broadcast over the

10  television, along with his name underneath him, for everyone

11  to know.

12      So in addition to the inherent danger of testifying, as

13  Mr. McGuire talks about, with respect to someone who is a

14  gang member of this nature, also Mr. McWhorter had the added

15  danger of risk associated with his being broadcast publicly

16  and well known for his cooperation in that regard.

17      It's my understanding, Your Honor, from conversations

18  with Mr. McGuire and others, that there are other individuals

19  who had cooperated or attempted to cooperate in this case

20  that suffered extreme injuries as a result of being stabbed

21  in prison at the CJC here in Nashville.

22      So the risk was not inconsequential.  It was, in fact,

23  very significant.  And I would submit it continues, in light

24  of Mr. McWhorter's continued custody.

25      I appreciate, as an aside, the efforts that the

1    Marshal's Service here has taken to move Mr. McWhorter to

2    another facility and do everything to protect him.  But, Your

3    Honor, I'm sure, from your own docket, is aware of the number

4    of cases in this district regarding or involving the Vice

5    Lords gang.  So that risk is very significant.

6         Finally, with respect to the timeliness of that

7    assistance.  While it is true, as the Government points out,

8    that Mr. McWhorter provided this information after he was

9    facing indictment in this case, it nonetheless doesn't

10   diminish the significance of that cooperation.

11        Nor does it diminish the fact that the timing within

12   which Mr. McWhorter cooperated enabled the state to use him

13   as a witness, and his information, in order to secure two

14   felony murder convictions against Mr. Cody in a case that was

15   largely circumstantial and which Mr. Cody had, prior to the

16   testimony of Mr. McWhorter at least, a defense to those more

17   serious charges.

18        So with respect to the considerations in 5K1.1 with

19   respect to the variance argument, Your Honor, I would submit

20   that Mr. McWhorter's cooperation in this case is extremely

21   significant and extremely warranting of this Court taking it

22   into consideration and departing from the guideline sentence

23   that has previously been announced of 120 to 150 months.

24        With respect to guidance for the appropriateness or the

25   appropriate level of the departure, I would submit that Your

1     Honor can utilize the departures previously given to

2     co-defendants in this case and, obviously, the Court's prior

3     experience with departures, for some basis for what an

4     appropriate departure would be.

5          In this case, as the Court is aware, the Government

6     filed motions under 5K1.1 with respect to Chad Vincent and

7     Anthony Kennedy.

8          In those cases, Your Honor may recall that those

9     individuals were allowed to plead, in the first instance, to

10    counts that carried significantly less time than the other

11    counts to which they may have been subject to liability,

12    which resulted in a reduction in and of itself.  And then on

13    top of that, the Court awarded additional departures of 40%

14    and 30% for those defendants in this case.

15         And I would submit that when weighing the nature of the

16    cooperation given by Mr. Vincent and Mr. Kennedy against

17    Mr. McWhorter, compared to the cooperation given by

18    Mr. McWhorter in the murder case involving George Cody, that

19    Mr. McWhorter is entitled to at least as much benefit or

20    consideration as those defendants received.

21         And I would respectfully submit that he is entitled to

22    greater benefit for the following reasons:

23         First of all, the testimony that Mr. Vincent and

24    Mr. Kennedy gave in this case, I would submit, was largely

25    cumulative.

1    As the Court recalls, there were statements that
2  Mr. McWhorter gave that were played for the jury.  There was
3  significant physical evidence that was presented to the jury.
4  And everything --
5    With the exception of the testimony related to the
6  William Blake ID in Count 5, which is a two-year sentence,
7  the testimony given by those individuals was largely
8  cumulative.
9    Compare that to the testimony that Mr. McWhorter gave in
10  the Cody matter, where it was admission testimony.  And it
11  was testimony that directly related to the defense that
12  Mr. Cody would assert in that case, and was such that
13  resulted in convictions for two felony murders compared to
14  financial crimes.
15    And, again, it's not to diminish this case.  But
16  certainly when we hold those two up, when you think of
17  cooperation in this case compared to cooperation in a double
18  murder case, it would seem to me that there's not much
19  comparison, aside from the fact that everybody has
20  cooperated.
21    Secondly, and equally important I would submit, is the
22  factor with respect to the danger or risk of injury to the
23  defendant in the matter of Mr. Vincent and Mr. Kennedy as
24  compared to Mr. McWhorter.
25    Mr. Kennedy's and Mr. Vincent's testimony may subject

them to some sort of generalized risk associated with dislike or disfavor with individuals providing any information to the Government. However, that's nowhere near the level of risk associated with the testimony that Mr. McWhorter gave against a known gang member, against a gang -- involving a gang that has a history of violence and is predominant within the prison system; exposing Mr. McWhorter to extreme risk not only from the individual against whom he gave the testimony, but against all individuals affiliated with that individual as a result of the gang affiliation.

So when measuring the value and weight to be attributed to the cooperation, I would submit that in this case, given the nature of Mr. McWhorter's cooperation and given the risks associated with that cooperation, that a reduction of 50% compared to the 30% to 40% for Kennedy and Vincent would be appropriate in this case, for all those facts and for all of those reasons.

And therefore, I would request that Your Honor grant a variance in this case based on his cooperation and assistance, considering the factors under 5K1.1, and reduce Mr. McWhorter's sentence by 50% from whatever within the guideline range. And I would ask that that be the bottom of the guideline range, 120 months. Understanding, of course, Your Honor, that we still have the 24-month consecutive sentence for Count 5 that goes on top of this.

       And with that reduction and with that additional
sentence, it would still recognize the seriousness of the
instant offense.  It would still result in a greater sentence
for Mr. McWhorter than any of the other co-defendants in this
case.  But it would nonetheless recognize the importance and
the value of that assistance that Mr. McWhorter gave and the
danger he faces associated with that cooperation, resulting
in a double murder conviction for an individual.

       Would Your Honor like me to address any other factors at
this time?  Or do you want to take these sort of in turn?

       The only other thing I really wanted to draw the Court's
attention to is certainly there are personal factors set
forth in our memorandum regarding Mr. McWhorter's upbringing.
And then also the disparity issue between the defendants in
this case, in light of the sentences that were handed out to
other individuals.

              THE COURT:  Okay.

              MR. FRENSLEY:  Thank you.

              THE COURT:  Mr. Howard, what do you say about that
substantial assistance and request for a variance?

              MR. HOWARD:  Your Honor, I don't dispute the
statements in Mr. McGuire's letter that Mr. Frensley attached
to his memorandum.  That is the entirety of the evidence that
Your Honor has before you regarding the assistance that this
defendant provided in an unrelated state case.

1    No one is suggesting that cooperating in a murder case

2    is not a good thing to do.  As we pointed out in our paper,

3    though, I think it needs to be viewed in context here for the

4    separate question of what benefit should the defendant get in

5    this case for the sentence.

6        The distinction between whether it's a good thing to do,

7    which it undisputedly is.  But the separate question is what

8    the benefit should be in this case.

9        The two points that I would just amplify here that we

10   mentioned in our papers are first, the defendant didn't do

11   anything, at least initially, to get this.  He didn't

12   cooperate.  He didn't approach law enforcement.

13       He had a piece of information fall into his lap

14   fortuitously, and he parlayed it to his advantage.  I'm not

15   disputing that's not a good thing in this case, given the

16   help that it provided the state.  But it is qualitatively

17   different than someone who elects to do something affirmative

18   in the first instance.

19       Secondly, I ask you to view it in context with the

20   timing and the overall proceedings that have occurred in this

21   case.  The defendant's cooperation only occurred when he knew

22   he was facing --

23       He had already been convicted and he knew he was going

24   to be facing a lengthy federal sentence.  That's different

25   from a defendant who sometimes even before they're arrested,

1    but shortly after they're arrested, gives up their right to a

2    defense, right to self incrimination, and so forth.

3         For those two reasons, I think the Court has to keep

4    what the defendant did in context.  Not denying it's a good

5    thing, that he cooperated, and it had a good result.  But

6    keeping in context what real benefit he deserves in this

7    case, which is different than the case he cooperated in.

8              THE COURT:  Thank you.

9         Mr. Frensley, does Mr. McWhorter wish to address the

10   Court?

11             MR. FRENSLEY:  Yes, Your Honor.

12             THE COURT:  All right.

13             MR. FRENSLEY:  Would you like us to come around?

14             THE COURT:  And you said you wanted to make a few

15   other comments about the proper sentence in this case or

16   other factors.  You can make those after Mr. McWhorter makes

17   his comments, or if you would rather make them before.

18             MR. FRENSLEY:  If I may.  Maybe I'll just make them

19   before.

20        Your Honor, may it please the Court.  Obviously, one of

21   the hardest things a judge has to do is impose sentence on

22   individuals who stand in front of them.  You've seen the

23   good, the bad, and the ugly.  Often more the bad and the ugly

24   than the good.

25        In this case, Your Honor, I would submit that based upon

1     the factors of 3553(a), most importantly based upon

2     Mr. McWhorter's post offense conduct in recent times with

3     respect to this cooperation in state court, that

4     Mr. McWhorter is not unredeemable.

5         This is an individual who possesses extreme capabilities

6     of intellect and ingenuity.  And if channeled in the proper

7     direction, I submit can be extremely productive in society

8     and can do very good things if he will direct it in the

9     appropriate way.

10        The presentence report includes a significant amount of

11    detail regarding the difficult life that Mr. McWhorter had.

12    He's had no recent contact with his family members.

13       His father left home, I believe, at the age -- when he

14    was nine years old.  He had no significant contact with him

15    thereafter.

16       Mr. McWhorter had a rough home life, to put it mildly,

17    culminating in problems with abuse relating to his mother,

18    criminal activities surrounding his family.  And his only

19    sibling, a brother, is facing a lengthy sentence of

20    incarceration in the Department of Correction even now.

21       In other words, Mr. McWhorter had a difficult time.

22    That was compounded by psychological issues that are also

23    reflected, with respect to depression, suicide attempts; and

24    at least during the course of the allegations in this

25    complaint, involved extensive drug use.

1    However, Mr. McWhorter has hope because he has two

2  children out there.  And he knows that he can find a better

3  way and that he can do better.

4    And I would submit that the great personal risk that he

5  undertook to cooperate with the state authorities in the Cody

6  case and that double murder are reflective of an individual

7  who sees an opportunity to do something better.

8    And I would ask that Your Honor take those factors into

9  account, consider those matters, and consider his ability of

10 redemption and rehabilitation when imposing sentence.

11   I would respectfully submit, for the reasons set forth

12 earlier, a sentence at the low end of the 120 month range,

13 further reduced as a result of his cooperation.

14   And, again, not to take too much issue with Mr. Howard's

15 position, but the fortunate thing here is that all

16 individuals who cooperate aren't doing it just out of the

17 goodness of their heart.  And that's why the guidelines set

18 forth factors to consider.

19   And I've taken the Court through each of those factors

20 and why they apply in this case.  And I would submit that in

21 light of those factors, the appropriate sentence would be one

22 of 60 months, followed by the 24 month mandatory sentence for

23 Count 5 in this case.

24   And Mr. Howard reminded me earlier, Your Honor, that

25 there's one more housekeeping matter, I believe, with respect

1      to reviewing the presentence report.  Confirming with

2      Mr. McWhorter that we have, in fact, reviewed the presentence

3      report, and its amendments as well.

4              THE COURT:  Okay.  Have you reviewed the most

5      recent revision of the presentence report, Mr. McWhorter?

6              THE DEFENDANT:  Yes, Your Honor.

7              THE COURT:  Okay.  That's the one that was revised

8      on June the -- what did it say?  10th?  June 10th, 2010?

9              THE DEFENDANT:  That's right.

10             THE COURT:  Okay.  I'll be happy to hear from you

11     now.

12             THE DEFENDANT:  Your Honor, first, I want to point

13     out that the videotape the night that I got arrested -- I

14     mean, it was flat out.  I'm glad that you recognize that

15     there was a bragging aspect of it.

16         It's one of those things that at the time, I wanted them

17     to focus on me.  I didn't want them to focus on my wife.  And

18     the bragging part of it kind of --

19         You know, it's a boastful thing that if you focus on me,

20     if you think that you have the right person, that you're not

21     going to pay attention to her.

22         I mean, throughout the case I know that the --

23     especially the relationship I had with her is greatly

24     diminished as a result of this case.  You know, we filed for

25     divorce.  She says that she don't want a divorce, but I can't

be around her.  The drug use.

I'm not diminishing the fact of how I got on drugs.  I'm a grown man.  If I didn't want her to get me on drugs, there's no way it would have happened.  That choice was mine. But, I mean, she was a significant influencing factor in that.

And, I mean, I just -- I can't be around her and that. I mean, there's just no way.  She's -- you know, it's one of those things that, like, she's gotten smarter with it.  Now, all of her drugs are prescribed.  But, you know, when you get down to it, she's still a drug addict.  And if I'm around that, I know what's going to happen to me.  I'm going to get back in trouble.  It's going to get in that where you need money.

And, I mean, I can't diminish the fact that I do have an ability to get money illegally.  I know that.  And I'm not -- it's wrong.  I mean, I have no doubt about that.  And I wish that there was --

I know that no matter what I say, it's just words. Which is one of the reasons why, you know, as Mr. Frensley pointed out, is why I actually did cooperate with Mr. Cody, to show an action.

As he was talking about, the gentleman who got injured, he was in the same cell with me.  He got 435 stitches over that.  There was different members other than Mr. Cody who

went after him.  As soon as they found out that he was
cooperating, they went after him.  435 stitches.  I think
two-hundred-something of them were in his face alone.

And I knew that when I contacted Metro.  I knew that
that had happened.  I knew why that had happened.  But I knew
that if I came up here and I just gave you words, you're
not --

I mean, I knew that there's no way, that no matter what
I say, you would buy that.  Which is the main reason why I --
I mean, it's one of the motivating factors of why I did what
I did do.

I know there's a case up here involving the Vice Lords,
where the whole -- I think there's five or six murders
attached to it.  Where the beginning of it was another gang
member told something to another gang member, that they
considered snitching, that reflected on his credibility -- or
not his credibility, but on his reputation.  And they
killed -- I mean, there's probably eight or nine people that
got killed over a discrepancy in somebody's reputation.

I mean, at a minimum, the guy is going to get 104 years
in prison.  At a minimum.  And, I mean, I know that they'll
come after me.

If I remain committing crimes, if I'm around that
aspect, if I'm around those type of people, I know what will
happen.  And by doing what I did, it makes it --

1    I mean, it's not only an act to try and show you that I

2 do want to change, but it's another motivating factor to me

3 that I can't -- I mean, I just, I can't, I can't go back to

4 committing crimes.

5    I'm not even going to stay in Tennessee.  I can't.  And

6 I know that.  And regardless of what type of departure,

7 whatever I get, the main -- one of the main reasons I did it

8 for myself was to get me out of that.  Because if I stay

9 here, I'll be right back in trouble.

10    Mr. Kennedy in the case, he actively writes me.  He

11 wants me to do this again.  He wants me to get out and help

12 him do this again.  And I don't want to.

13    I am so sick of this.  I'm so sick of jail.  I'm so sick

14 of courts.  I'm just --

15        THE COURT:  Well, that's a good thing that you're

16 sick of me and the courts, all these.  You don't want to see

17 me anymore.  I can understand that.  And I hope you don't.

18        THE DEFENDANT:  What I want --

19    I know -- I know I've still got to go to prison.  I know

20 that.  I don't want to get let go, because I don't need that.

21 If I get let go, I'll get back in trouble again.  I know

22 that.

23    What I want is there's -- I want to learn a new trade.

24 I mean, that's first and foremost.  The biggest thing that

25 gets me in trouble is the skills that I do have, nobody wants

1 them because I'm a felon.

2   I can draw pictures like black and white photos.  I mean

3 I'm -- I mean, perfect.  But anything like that deals with

4 trademarks or deals with copyrights.  And they don't want

5 convicted felons around that.  I mean, I've applied.  I've

6 tried.  They just don't want it.  The computer knowledge they

7 don't want.  They won't accept the fact --

8   I mean, I'm a seven-time convicted felon.  They don't

9 want that.

10    THE COURT:  Well, I'll tell you, you've got a

11 hurdle to overcome, being a convicted felon.  But you were a

12 convicted felon before you came here.

13    THE DEFENDANT:  No.  No.  I know.  There's no doubt

14 about that.

15    THE COURT:  So you use that as an excuse, I guess,

16 to go back to crime.

17    THE DEFENDANT:  No.

18    THE COURT:  Now, you're smarter than that.

19   There are convicted felons that get jobs.  They have to

20 prove themselves.  And it's tough to get that job.  You may

21 have to prove yourself at a job that you really are not crazy

22 about doing, but you do that for a while and you begin to

23 build trustworthiness and reliability.  And it's one step at

24 a time.

25   I'll admit that you've dug yourself a hole, but you're

the only one who can get out of it.

THE DEFENDANT: I know, Your Honor.

THE COURT: I would say your first problem, though, is making sure you get rid of this -- you're in recovery from drugs.

THE DEFENDANT: Absolutely.

THE COURT: Because you'll be tempted.

THE DEFENDANT: I've rejected it in jails. You know, a lot of people think that when you're in jail, you can't do drugs. And that's not true.

THE COURT: Oh, I know that.

THE DEFENDANT: Yeah. There's plenty of it. And I've turned it down every time. I've been offered it numerous times. I turn it down every time.

I go to AA and NA meetings. Well, I did when I was in Nashville. At Grayson County they offer it, but only to the county inmates, not to the federal inmates.

I want further treatment. I want that. I hated -- I mean, I hated being on drugs. That was --

I never even seen cocaine until I was 26 years old. I never laid eyes on it. The first night that I saw it, I shot. And, I mean, to go from -- I smoked a joint when I was 14 or 15 years old. To go from that, to shooting drugs instantly.

I mean, the change. That affected me mentally,

physically, everything.  That completely altered everything about me.

You know, again, I can't use anybody else as an excuse. I made those choices, to put myself in that position and to try it and to get addicted to it and go on from there.  And that's what fueled a lot of the criminal acts involved in this.  And it just --

I want the treatment.  I want to get away from Tennessee.  I want to get a new trade.  And at Grayson County, they have a book that shows all different apprenticeship programs, vocational programs within the BOP.

They have an electrical program, an apprenticeship program.  I've heard that it's a two-year program.  And then after that, you're able to take the journeyman license test.

That's a very good-paying job.  I've never seen a construction job or electrical job, anything involving that, where they care whether you're a criminal or not.  It's not the aspect of whether or not you've been convicted before, it's just whether or not you can do the work.  And, you know, that's at least 24 months to do that.

I would like to get, you know, a degree.  I think Mr. Frensley is going to ask you, and I'm going to ask for it as well, to be recommended to FCI Tucson.  It has all the programs that I want.  It has the -- it offers an associate's degree program.  It has the apprenticeship program with the

electrical.  They've got the drug program there.  It's a
40-hour one.  They don't have the 500-hour one there.  They
have the 40 hour.  They have AA, NA.  They offer everything
that I want.

     With the sentence that Mr. Frensley is recommending of
84 months, if you take off the time that I've already served,
that will give me enough -- ample time, actually, to complete
the two-year course, complete the drug program that I need to
continue my recovery process on that.  And after that, I'm
able to get out and able put that to use and try to further
myself.

     I want to continue going to school after I get out for
auto engineering; which is one of the reasons why I want to
take the electrical, because they kind of go hand in hand
with each other.

     But, I mean, those jobs pay really good.  And it's one
of those things whether or not you can do the job, not your
past or what all you've done.  It's just can you -- are you
capable of doing this?

     And I mean, I just -- I've tried to do what I can
action-wise to show you that I do want to change.  And I
just -- I ask the Court to take that into consideration.

     And the sentence that Mr. Frensley is proposing, I think
it fits everything.  It's double the sentence that the other
co-defendants received.  And it --

1          I mean, personally, I think it fits to where I can do my

2    programs and still be able to get out when my kids are still

3    under 18, and be able to become productive.  And so that way

4    I don't have to keep coming back through this stuff.

5               THE COURT:  Thank you.

6               MR. FRENSLEY:  Thank you, Your Honor.

7               THE COURT:  Mr. Howard.

8               MR. HOWARD:  I think when the Court sets an actual

9    sentence, it should focus on three things.

10         First, I'll address this prominently, the defendant's

11   leadership of this criminal enterprise.

12         It is beyond dispute, in my view, that but for the

13   defendant, this crime wouldn't have occurred.  None of the

14   other eight co-conspirators could have remotely -- could have

15   remotely pulled this off or had the skills to do it, even if

16   they wanted to.  I don't think there could be any serious

17   dispute about that.

18         This defendant was the leader.  This defendant was the

19   one that made it work and made it work for as long as it did.

20   And, quite frankly, it probably would have lasted a lot

21   longer if it weren't for the effects of the drug addiction

22   that he and some of the others were experiencing.

23         He was the leader, the intellectual and creative force

24   behind that.  That puts him into a different class than any

25   of the other co-defendants.

1        This is now the ninth sentencing in this case that I've

2   appeared before the Court on.  And I reflected back on some

3   of those other ones and the co-defendants that came before

4   him.

5        There's been a lot of talk about Mr. Kennedy and

6   Mr. Vincent; which, you know, by any account, are not

7   terribly savory characters.  But I also recall some of the

8   lesser members of the conspiracy that were drawn in and were

9   recruited and used by the defendant.

10       People like his wife, Beatrice.  And Chastity Leonard.

11  And Dave Mayo.  And Roger Rapp.  Some of these people that

12  suffered from severe mental limitations and drug addiction

13  and a whole host of other issues.  But these were the type of

14  people that this defendant, I think it's fair to say, was

15  preying on.

16       They weren't making a lot of money.  They were the ones

17  out on the front lines, cashing these checks.  And the

18  defendant was the one that was making money off those, shall

19  we say, marginal people.  People that had more problems, far

20  more problems, than the defendant.

21       It was his leadership of that group that make this

22  possible.  He affected not only the victims in this case, but

23  these other co-defendants.

24       So I think his leadership and the skill and intellect is

25  the first point the Court should consider.

1        Secondly, as in any case, financial or otherwise, the
2    effect on the victims is important.  It's a $200,000,
3    $300,000, $400,000 case, depending on how you view the
4    numbers.  But that's really not the issue, in my view.
5        This is a deception.  This is a deception-laden case.
6    There were small stores out in the country, in places like
7    Sparta and McMinnville, where losing three or four, five
8    checks in a month makes a big difference.
9        We heard testimony from some of those people at the
10   trial.  The gentleman from Kingwood Foods, the gentlemen from
11   some of the other markets that came here to testify.  It had
12   a significant effect on them.
13       And those places were targeted because, as the Court
14   pointed out, they had less security.  They were less thorough
15   in their procedures.  The effect on the victims is
16   significant.
17       Last, I suggest to the Court that you should recall the
18   defendant's utter and complete lack of remorse in this case.
19   He's upset today.  I understand that.  Everyone is upset the
20   day they get sentenced.  But it's not just the videotape that
21   we referred to so much and the Court has seen so much of,
22   with the arrogant boasting and the taunting of the police
23   officers and the braggadocio.  It was a thread that ran
24   through everything in this case.
25       We heard testimony at trial from Ronnie Hampton, where

1    he asked -- Ronnie Hampton, a guy who has been in prison most
2    of his life, has no skills.  He asked the defendant, Why
3    aren't you out with a real job?  You're so smart, why aren't
4    you out with a real job?

5        And what was his response?  I don't want to do that.  I
6    don't want to do that.  Words to that effect.  I want the
7    easy money that I can get this way.  That was who -- that was
8    the person in this case.

9        Now, there's been suggestion that the drug abuse turned
10   the defendant into something very different in this case.
11   And we can certainly all appreciate the ravages of drug
12   addiction.  But if you take a look at the presentence report,
13   it's thirty-some pages long of criminal history.

14       The defendant is a lifelong -- as an adult, he's a
15   lifelong criminal.  And they're all the same.  It's all
16   deception.  It's all fraud.  He wasn't on drugs when that was
17   happening.

18       Even the conviction we were talking about today, the
19   1999 Missouri conviction.  You know, that's 11 years ago.
20   It's a consistent, consistent pattern, that culminated in
21   this case, which is of significance for this type of
22   counterfeit check cashing ring.  So I ask the Court to bear
23   that in mind.

24       I think when you focus on the defendant's leadership and
25   skill, the effect on the victims, and his complete and utter

1    lack of remorse, that a guideline range sentence in the upper

2    half of the guideline range is appropriate in this case.  And

3    that's what the Government is requesting.

4         And the last question that I think, in my mind, is

5    significant in this case, that I would ask the Court to

6    ponder when you try to fix that number, is based on

7    everything we've seen in this case -- at the trial, the

8    suppression hearings, the videotape, the presentence

9    report -- one question that I think is worth asking is:  But

10   for this case, is there any question in any reasonable

11   person's mind that this defendant would be out committing the

12   same crimes, the same way, again and again and again?

13        I would suggest that the answer to that question is no.

14   The defendant is undeterred and he'll be undeterred in the

15   future.  The Court should sentence him in an appropriate

16   fashion.

17             MR. FRENSLEY:  Your Honor, may I raise one other

18   matter?

19             THE COURT:  All right.

20             MR. FRENSLEY:  That is as it relates to

21   Mr. McWhorter's jail credit, Your Honor.

22             THE COURT:  What page?

23             MR. FRENSLEY:  Page 2 of the presentence report.

24        I understand that in large part, matters of jail credit

25   are issues for the Bureau of Prisons.  But I just wanted to

1       point out to the Court that in this matter, Mr. McWhorter was

2       arrested on November the 8th, 2006, and stayed in state

3       custody until November the 17th, 2006, at which time he was

4       transferred to the Department of Corrections.

5           And then the next point is the relevant date for this

6       matter.  He was transferred to federal custody on a writ from

7       the Department of Corrections on October the 12th, 2007.

8           Just for the Court's information, I'm not sure how the

9       Bureau treats that matter.  But I wanted to bring it to the

10      Court's attention that it's our belief that from the point of

11      October 12th, 2007, Mr. McWhorter has been in federal custody

12      on this matter.

13          It appears that perhaps the state may have run that time

14      concurrent, counted it against that, but I would ask that

15      Your Honor take that into account and perhaps make some

16      findings with respect to that for the benefit of the Bureau,

17      if Your Honor agrees with our position that as of October

18      the 12th, 2007 he was in federal custody on these charges,

19      under indictment in this case, and moving forward in this

20      case.

21              THE COURT:  So what exactly are you asking me,

22      Mr. Frensley?

23              MR. FRENSLEY:  Well, Your Honor, I would like for

24      the time from October the 12th, 2007 to count toward

25      Mr. McWhorter's sentence in this matter, given that as of

1    that date he was in federal custody and in federal custody in

2    relation to these particular charges.

3           THE COURT:  So you're saying he should be given

4    credit for all time from October 12th, 2007?

5           MR. FRENSLEY:  Yes, Your Honor.  Even though his

6    arrest was in November of the previous year, he stayed in

7    state custody.  But then it appears he was writed out.

8       So it's my understanding that Tennessee was counting

9    that time.  But for purposes of his federal sentence, Your

10   Honor, I just ask that Your Honor make a finding that his

11   custody -- he should receive credit against his federal

12   sentence for that time period, since that's the relevant date

13   at which he was brought into federal custody on these

14   matters.

15           THE COURT:  Okay.

16           MR. FRENSLEY:  Thank you, Judge.  I apologize for

17   not bringing that up sooner.

18           THE COURT:  As I have mentioned, the Court's

19   responsibility is to select a sentence sufficient but not

20   greater than necessary when considering all the relevant

21   sentencing factors found at 3553(a).

22      The Court has previously found that the advisory

23   guideline range is from 120 to 150 months.

24      The first sentencing factor to be considered is the

25   nature and circumstances of the offense.  We've commented

about that.  It's a conspiracy offense that lasted some eight months, hundreds of counterfeit payroll checks, hundreds of Tennessee driver's licenses that were falsely produced with sophisticated means.  And there were hundreds of victims, as set forth in the Government's exhibits.

It's been difficult to computate not only the actual amount of loss, but the intended loss.  We spent lots of time trying to determine that.  A lot of it is because of the number of people involved cashing checks with fictitious IDs, using fictitious Social Security numbers and so forth.

Wal-Mart, who is an extremely large corporation, lost a great deal of money.  It's not entirely satisfactory just to say well, they can afford it; which indeed they can, but they're entitled to protection under the law just as is the local independent businessmen and women.

And, as we have also noticed, there were many of those who lost money.  They don't have the same system set up to monitor all their losses and record the various attempts to cash checks.  But it was a sophisticated procedure that fooled a lot of people.  And as a result of that, they lost a lot of money.

But the offense is also serious in that identity theft is a growing plague in this country.  And I say that because it is ruining businesses and lives and costing the country and many individuals and companies lots of money.

And because identity theft in some cases is so easy for people who have a criminal mind, more and more people are entrapped and more and more money is being spent to try to deter this crime.

The sentence is also to reflect the history and characteristics of the defendant. Mr. Howard said that Mr. McWhorter had been a criminal all his life. That may stretch it a little bit, but his criminal activity did begin at a very young age. I think he was 20 when he cashed his first bad check. And he continued at those early ages, at 21 and 22. So he started off on the wrong track.

He did have a troubled childhood. He had some early psychiatric issues as a result of his home life. He was raised primarily by his mother. His parents divorced when he was three, and he's had very little contact with his father since then.

But he and his mother didn't get along. They fussed and literally fought. A domestic assault warrant was taken out by his mother against him. He stole his mother's car and debit card when he was a teenager. They also had fights.

His older brother is incarcerated. And when he was 17, he had some psychiatric problems and was admitted to the Tennessee Mental Health Institute for observation and treatment.

Some of that might be attributable to the fact that he

dropped out of school. He started using marijuana when he was 14; and later on, as he testified, he began to use cocaine. He also used heroin, Dilaudid, morphine, ecstasy. And he's mentioned the effects of that on him mentally and physically. And drug addiction is a mental disease that does affect your brain, as he is smart enough to figure out.

He was married in 1998. He was divorced. He has two children. He says he wants to get out of prison so he can help to reestablish his relationship with them. One is 11 and one is 10. Both girls. They now live with his wife's grandparents.

The presentence report says he's $32,000 behind in child support. There are also installment debts that are outstanding.

His work history is very spotty and inconsistent. He realizes that he has the ability to make an honest living, but his bent has been in the opposite way -- in making an easy living, but not a lawful living.

The second consideration is for the Court to select a sentence that would reflect seriousness for this offense and promote respect for the law.

As I've mentioned, this is a serious offense. This identity theft is more than just passing a bad check, which that's what he began with. But the kind of identity theft that he was involved in was much more sophisticated and

1    dangerous.

2         Selecting a sentence that will promote respect for the

3    law is a challenge, in that it appears from his record that

4    he does not and has not in the past respected the law.  He

5    has tried to evade the law and made his decisions basically

6    about the risk and rewards rather than whether it's legal or

7    illegal.

8         But he now says that he has changed, that he really does

9    want to change.  He's talked about learning a trade.  He

10   understands he has the ability to make a living lawfully.

11   And that he wants to use his time in prison to pursue

12   vocational pursuits, to try to learn a trade and maximize his

13   talents.

14        And the question the Court has is he going to be able to

15   back up his rhetoric with his actions and will he begin to

16   respect the law and the rights of others.

17        And the Court also has to consider what is just

18   punishment.  One of the goals of sentencing is to punish for

19   their bad acts.  What is just punishment for this offense.

20   And furthermore, the Court must consider adequate deterrence

21   to criminal conduct in the past.

22        Mr. Howard posed a question in his ending remarks about

23   but for this case, would the defendant still be out on the

24   streets, so to speak, perpetrating crimes against the public.

25   Well, he's spent a long time in jail.  He's been in jail

since November of '06.  Not all in federal custody, but he's
been in jail since this crime arose.  And the Court senses
that he is tired of it.  As I remarked, it is a good thing
that he is tired of it.

What will protect, also, the public from crimes of this
defendant.  Mr. Howard has also pointed out some of his
criminal history, which indicates that he's been flimflamming
people out of money for quite some while through criminal
activity.

He's in the highest criminal history category.  He has
six convictions for which he received criminal history
points, but many of those convictions had multiple counts.
And they involve bad checks, theft of property, fraud, theft
of ID, forgery, evading arrest, reckless endangerment, and
domestic assault.

And then there's a number of arrests or pending charges
for which he received none.  They don't count in his
calculations of criminal conduct, but they do indicate how
he's been operating on the fringe.  More bad checks.  13
counts of forgery.  14 counts of theft.  More forged checks.
Conspiracy to pass forged instruments.  Conspiracy to pass
forged checks.  Criminal simulation.  And being a fugitive
from justice.

So what we need to consider is what will protect the
public from further crimes.  Additionally, the Court should

consider how can he be improved by prison programs such as
education, vocational, medical, and so forth.  And he, to his
credit, has mentioned his interest in pursuing some of those,
including drug treatment.

The defendant has asked for a variance from the advisory
guideline range, primarily because of his cooperation in this
state prosecution.  The defendant has asked for a variance of
50% of what would be the low end of the guideline range.

The Government contests that; doesn't dispute the facts
in the letter from the district attorney in Davidson County,
but questions how that assistance helped his office in this
case, how it would impact this case; and, in fact, how it
would reflect on the sentencing factors in 3553(a).

First, I will say that the Court does not believe that
Mr. McWhorter, being in the highest criminal history category
and with his record of prior criminal activity and his
failure to learn from past mistakes, should be on the low end
under the sentencing range.  A good argument could be made
that he should be at the high end of the sentencing range.

But he's not the worst of the worst that this Court
sees, by any means.  So the Court has selected a mid range
category for Mr. McWhorter.  And based on his substantial
assistance to the state, the Court will reduce that mid range
for 35 months.

That does not represent, as I say, the 50% reduction.

1      And I didn't transpose the 35 months to a percentage, but it

2      represents almost three years of imprisonment.

3           With that variance, which the Court grants because the

4      Court finds he did render substantial assistance in that

5      murder trial in the Metropolitan Davidson County courts --

6      and according to the D.A., the defendant apparently was

7      timely in terms of his notification that he had knowledge,

8      important knowledge, relevant to the prosecution of that

9      case.  They found it to be timely.  They also found that his

10     testimony was reliable and it was truthful.  And it was

11     issued with knowledge beforehand that there was some risk

12     involved in his revealing that information.

13          Mr. McWhorter has also referred to another inmate that

14     was punished severely because of his cooperation with the

15     authorities while he was in jail.  So there was risk, serious

16     risk, of bodily harm from fellow gang members in prison.  And

17     a certain amount of risk will continue as he serves out his

18     sentence.

19          Further, the Court considered the fact that he did

20     testify not only before the trial to give evidence, but also

21     at the trial.  And according to the assistant D.A., his

22     testimony was material in bringing about the conviction of

23     the accused in that case, a Mr. Cody.

24          So the Court grants him credit for that state

25     cooperation, even though he did not cooperate in this case

1    and put the Government to the burden at every turn.  But the
2    Court gives the defendant credit.

3        And perhaps he has matured.  He's now 31.  Still a very
4    young man.  But he's spent a lot of the last few years in
5    prison.  And the Court credits his heartfelt statement that
6    he not only wants out, he wants to turn his life around.

7        He wants to get off of drugs, learn a trade, earn a
8    living -- a lawful living for him, and reestablish a
9    relationship with his daughters.

10    This will allow him to do this with a sufficient
11    sentence, but one which the Court believes is not greater
12    than necessary to meet all the sentencing factors that I have
13    mentioned.

14        The Court was aware of the sentencing options available
15    to it.  The Court also considered, as mentioned by
16    Mr. Frensley, sentence disparities.  Some of the other
17    defendants were granted a larger percentage.  But the
18    guidelines are set up so that if you are in the highest
19    criminal history category, then each level represents a much
20    larger reduction than if you're in a smaller or a lower
21    criminal category.

22        The Court also considered in that connection the
23    importance of that cooperation that he gave and the
24    cooperation they gave in their assistance to the Government
25    in this case.  Some were there from the very beginning.  Some

1    entered later and knew less about the case.  Some of their

2    testimony was important, especially as it related to his

3    conviction on Count 5; which I now mention is simply a

4    guideline sentence.

5        The advisory guideline sentence is the statutory

6    sentence for Count 5.  It requires a 24 month sentence, which

7    is to be served consecutive to the underlying sentence.  So

8    the 100 month sentence on Counts 1, 2, 3, and 4 will be

9    followed by a 24 month sentence for Count 5, for a total of

10   124 months.

11       With that analysis, the Court will now formally state

12   the sentence, Mr. Frensley.  So if you and Mr. McWhorter

13   would stand, the Court will state the sentence.

14       It is the judgment of the Court that the defendant,

15   James C. McWhorter, is hereby committed to the custody of the

16   Bureau of Prisons to be imprisoned for a term of 124 months.

17       The 124 months shall be divided by terms of 100 months

18   on Counts 1, 2, 3, and 4, each of which is to be served

19   concurrent with each other.  As to Count 5, the Court imposes

20   a 24 month sentence which will be served consecutive to

21   Counts 1, 2, 3, and 4.

22       Upon release from imprisonment, the defendant shall be

23   placed on supervised release for a term of three years.  The

24   three-year term of supervised release shall apply to

25   Counts 1, 2, 3, and 4, with each such term to run

concurrently with each other, each other count.

And as to Count 5, the Court imposes a period of supervised release of one year, which will run concurrently with the terms of supervised release on Counts 1, 2, 3, and 4.

The Court has determined that the restitution in this case shall be $114,536.26. That amount is arrived at by the prior sum that the parties and the Court have discussed of $84,096.38. I've subtracted $1,800.27 as a figure that has been shown by the defendant to be over-representative of some of the charges on the list. That would reduce that $84,000 figure to $82,296.11.

The Government has reminded the Court that the minor businesses, that is all of those other than Wal-Mart, who sustained losses had not -- those figures were not included. The Court added those up and they are $32,240.15. And when that is added to the $82,296.11, it produces $114,536.26.

There will also be a special assessment of $100 for each count of conviction, for a total of $500.

There will be no fine in the case. The Court finds that Mr. McWhorter is not in a financial position to pay any fine for the cost of the crime or the cost of his incarceration or the cost of his supervised release. That's especially true in view of the large restitution figure that will be imposed in this case.

1        Mr. McWhorter, as you know, after you are released from

2     prison you'll be subject to certain conditions that will

3     govern your conduct while you're on supervised release.

4     They're the mandatory and standard conditions which apply to

5     most all federal defendants.  They'll be included in your

6     *Judgment and Commitment* order.

7        However, there will be certain special conditions which

8     will also apply in your case.  Payment of restitution is one

9     of those special conditions.  The restitution shall be due

10    and payable immediately.

11       Of course, Mr. McWhorter is now in jail and will be

12    transferred to a federal prison facility.  But while he's

13    there, he will begin his payments under the Bureau of

14    Prisons's Inmate Financial Responsibility Payment Program.

15       And those payments will be submitted to the Clerk of

16    this Court, the United States District Court, here at 801

17    Broadway, in Room 800.

18       The defendant shall be required to pay a minimum monthly

19    rate of 10% of the defendant's gross monthly income.  No

20    interest shall accrue as long as the defendant remains in

21    compliance with the payment schedule, as ordered.

22       And then they will continue after he is released from

23    prison.  He'll be required to pay at least 10%, not less than

24    10%, of his total monthly income from all sources derived.

25       Payments will continue to be made to the Clerk of this

1    Court.  No interest shall accrue as long as the defendant

2    remains in compliance with this payment schedule.

3        The defendant, in that connection, is required to notify

4    the court in writing if there's any material change in his

5    economic circumstances that might affect his ability to pay.

6        The Court is going to recommend that Mr. McWhorter also

7    receive benefit of the intensive drug program while he's

8    incarcerated.

9        After he's released, he'll be subject to random drug

10   testing, a program of drug testing and substance abuse

11   treatment if recommended by the probation officer, which may

12   include a 30 day inpatient treatment program.

13       But after he is released, he'll also have to undergo a

14   program of nine months of outpatient treatment, drug

15   treatment, by attending NA meetings or AA meetings here in

16   the Davidson County area.

17       He'll have to attend those meetings twice a month for

18   the first three months, and not less than one meeting per

19   month for the first year.

20       As you probably know, Mr. McWhorter, those meetings are

21   held multiple times a week, all over the city.  If you're in

22   Cookeville or that area, the requirements will be the same

23   unless you find that there's no meeting place in the

24   proximity and that that would, therefore, result in a

25   hardship on you being able to attend those monthly meetings.

I mean those weekly meetings.

I say that just because my experience is that is the critical time for recovery.  And nobody knows an addict like an addict.  And my experience also tells me that people that go through the 30 day wonder treatment and don't follow up are likely to relapse.

So you can get a lot of support from these people that are going through the same thing as you, but you're still an addict subject to temptation and subject to relapse.  Just like we had one last week that had completed their recovery and was tempted and ended up robbing a bank to get money for some drugs.  So he's starting over.

But it's very tough to throw that habit.  The good news is you can beat it, but you've got to be smart and diligent and consistent.

That's why I'm putting that as a part of your supervised release.  Not to punish you, but to put a requirement on you that will inure to your benefit.

You're smart enough to do a lot of things.  You've got more ability than lots of people that I see.  But the drugs -- it doesn't matter about your brain power.  If they get ahold of you, it doesn't matter whether you are a judge or work as a mechanic or you're a school teacher.  It affects them all.

So work hard at that.  And while you're in prison, take

advantage of every program you have for mental health

treatment or drug treatment, so you can build up that

resistance.  And it will also broaden your ability to obtain

employment after you're out.

     If you have money or have insurance to pay all or part

of the cost of this drug treatment, then you'll be -- or

mental health treatment, if directed by your probation

officer, you may be required to contribute all or part of the

cost of that.

     I just remind you of things you probably already know.

But drug treatment outside, in the public, is usually very

expensive.  So take advantage of the opportunities while

you're there.  These weekly meetings are generally free, but

the inpatient part is not.

     You also may be required to furnish financial

information to your probation officer, including where you

work, when you work, your rates of pay, when you're paid,

your monthly expenditures, assets, liabilities, and any other

relevant information that may be requested of you.

     Also, you're not to incur any new debt while these

obligations are outstanding without the approval of your

probation officer.

     You'll have to cooperate with the probation officer in

the collection of a DNA sample.  That is required.

     And, of course, as a convicted felon you are prohibited

1    from owning, carrying, or possessing any firearms, dangerous

2    weapons, or destructive devices.

3         You, of course, have a right to appeal the --

4         First, let me say that all the conditions of supervised

5    release, those that will be the mandatory and standard

6    conditions in your *Judgment and Commitment* order and those

7    special conditions I've just stated, are all important.

8         Should the Court find after a hearing that you've

9    violated any of the conditions of supervised release, the

10   Court may revoke your supervised release and require you to

11   serve in prison up to the entire period of the supervised

12   release.

13        Furthermore, revocation of supervised release is

14   mandatory for certain violations, such as possession of a

15   controlled substance.

16        The Court has stated the reasons for the sentence and

17   will not repeat any of those.  The Court will summarize by

18   saying that the Court believes that the sentence imposed is

19   one sufficient but not greater than necessary to meet those

20   sentencing factors in 3553(a).

21        You do have a right to appeal the sentence that I've

22   imposed, Mr. McWhorter.  Mr. Frensley is very familiar with

23   the appeal statute.  I do remind you, however, that the time

24   for appeal is a short window.  It's 14 days.

25        If you wish to appeal, you must appeal within that 14

day period or you will be deemed to have waived your right to appeal.

You can appeal as an indigent person, without funds. If you so request, the Clerk will file a *Notice of Appeal* on your behalf.

Are there any other questions by the Government or you, Mr. Frensley, before we adjourn?

MR. HOWARD: None from the Government.

MR. FRENSLEY: I have just a few matters, Your Honor.

First, you'll recall Mr. McWhorter asked that Your Honor make a recommendation that the Bureau of Prisons place him at FCI Tucson.

Again, the rationale behind that was related to the cooperation in the Cody matter. The Vice Lords is primarily a gang originating out of Chicago, with not a great deal of influence west.

Mr. McWhorter, as Your Honor will recall from the presentence report, also has some background, having lived in Nevada for a period of time, but would ultimately like to relocate to that part of the world.

So we would ask that Your Honor make the recommendation, subject to the Bureau of Prisons' space and security requirements, that Mr. McWhorter be housed at FCI Tucson.

And likewise, Your Honor, that should he ultimately,

1      upon release, stay on the west coast or in that area, that

2      the conditions that Your Honor has imposed could easily be

3      met there with respect to the follow-up treatment and the

4      like.

5          And then the only other matter, Your Honor, was the one

6      that I brought to your attention regarding the jail credit.

7      As the report reflects, and the evidence in the case --

8                 THE COURT:  I've got that you're requesting that he

9      receive federal credit for all time spent in jail since

10     transferred to federal custody on 10/12 --

11                MR. FRENSLEY:  '07.

12                THE COURT:  '07.  Yes.

13                MR. HOWARD:  Judge, just I failed to mention it

14     myself.  Our position on that is that's a BOP matter.

15         My understanding was that Mr. McWhorter was getting

16     credit on a state sentence until he came to federal custody

17     in January of 2009.  If that's the case, his federal sentence

18     should run from that point.  If, of course, that's not the

19     case, then it should be calculated earlier than that.  But in

20     any event, it's a Bureau of Prisons' calculation.

21                THE COURT:  Okay.

22         Anything further, Mr. Frensley?

23                MR. FRENSLEY:  I believe those were the only

24     matters I had.

25                THE COURT:  Pardon me?

1          MR. FRENSLEY:  Those are the only matters, Your

2     Honor.  I believe Your Honor already addressed the intensive

3     drug treatment.

4          THE COURT:  I have the jail credit, intensive drug

5     treatment, be housed as close to Tucson.  You said there is a

6     Tucson federal prison facility there.  That he be housed

7     there, if possible.

8          Is that it?

9          MR. FRENSLEY:  Yes, Your Honor.

10          THE COURT:  Okay.  We'll stand adjourned.

11          MR. FRENSLEY:  Your Honor, I apologize.

12          Just that you allow him to transfer to that -- that the

13     supervised release be served after his release out there, if

14     that's where he ends up.

15          THE COURT:  He has a chance to pick his residence.

16          MR. FRENSLEY:  Right.

17          THE COURT:  It's a matter of procedure.

18          Generally, the probation officer where he's residing

19     will supervise him.

20          MR. FRENSLEY:  Yes, Your Honor.

21          THE COURT:  So wherever he reports.  He'll have to

22     report to the federal probation office where he resides

23     within that time period that I mentioned.

24          MR. FRENSLEY:  Thank you.

25          THE COURT:  If he says I'm living here, they'll

1    assign him somebody to supervise him.

2              MR. FRENSLEY:  Thank you, Your Honor.

3              THE COURT:  If he moves, they'll probably transfer

4    that to somebody else.

5              MR. FRENSLEY:  Yes, sir.

6                        (Recess was taken at 4:00 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          REPORTER'S CERTIFICATE

2

3                  I, Dorothy Stiles, Official Court Reporter

4       for the United States District Court for the Middle District

5       of Tennessee, with offices at Nashville, do hereby certify:

6                  That I reported on the Stenograph machine

7       the proceedings held in open court on June 28, 2010, in the

8       matter of UNITED STATES OF AMERICA vs. JAMES C. McWHORTER,

9       Case No. 3:07-CR-00159-1; that said proceedings in connection

10      with the hearing were reduced to typewritten form by me; and

11      that the foregoing transcript (Volume 8, Pages 537 through

12      697) is a true and accurate record of said proceedings.

13                  This the 23rd day of September 2010.

14

15

16

17

18

19                          /s/ Dorothy Stiles, RMR, CRR

20                             Official Court Reporter

21

22

23

24

25